**Joseph C. ANDERSON, Plaintiff,**

**v.**

**HEDSTROM CORPORATION
and Bradlees Stores, Inc.,
Defendants.**

**No. 98 Civ. 5174(LMS).**

United States District Court,
S.D. New York.

Nov. 24, 1999.

Raymond J. Keegan, Raymond J. Keegan & Assoc., LLP, White Plains, NY, for plaintiff.

Michael J. Venditto, Kensington & Ressler, L.L.C., New York City, for defendants.

## MEMORANDUM DECISION AND ORDER

LISA MARGARET SMITH, United States Magistrate Judge.

Plaintiff Joseph C. Anderson ("plaintiff" or "plaintiff Anderson") brings this action against defendants Hedstrom Corporation ("Hedstrom") and Bradlees Stores, Inc. ("Bradlees"), to recover for personal injuries he suffered when he fell from a trampoline that was manufactured by Hedstrom and sold by Bradlees. Plaintiff alleges causes of action against both defendants sounding in negligence, strict liability, and breach of implied warranties. Pursuant to the provisions of 28 U.S.C. § 636(c), the parties have consented to conduct all proceedings in this case before me.

Defendants have filed a motion for summary judgment, asking for dismissal of the plaintiff's claims against both defendants under all causes of action. Defendants

argue that plaintiff assumed the risk of the injuries he suffered, thereby precluding his causes of action; that he has failed to establish a triable issue as to either a failure to warn by the defendants, or a design defect in the trampoline; and that even if he did arguably establish a triable issue as to either a failure to warn or a design defect, neither of those alleged deficiencies proximately caused plaintiff's injuries. For the reasons discussed below, defendants' motion for summary judgment is denied in its entirety.

## STANDARD FOR SUMMARY JUDGMENT

In accordance with Federal Rule of Civil Procedure 56(e), "[a] motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgement for the moving party as a matter of law." *Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 202 (2d Cir.1995); *see generally Celotex Corp. v. Catrett,* 477 U.S. 317, 320–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The standard for summary judgment "provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The Court's responsibility is to perform "the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved by a finder of fact because they may reasonably be resolved in favor of either party." *McNeil v. Aguilos,* 831 F.Supp. 1079, 1082 (S.D.N.Y.1993) (quoting *Liberty Lobby,* 477 U.S. at 250, 106 S.Ct. 2505). The moving party may rely on the evidence in the record to point out the absence of genuine issues of material fact.

*Celotex Corp. v. Catrett,* 477 U.S. at 323, 106 S.Ct. 2548.

The responding party must set forth facts showing that there is a genuine issue for trial. FED.R.CIV.P. 56(e). A summary judgment motion cannot be defeated by speculation or conjecture. *See Pollis v. New Sch. for Soc. Research,* 829 F.Supp. 584, 586 (S.D.N.Y.1993) (quoting *Western World Ins. Co. v. Stack Oil Inc.,* 922 F.2d 118, 121 (2d Cir.1990)). Rather, the responding party must show the existence of a disputed material fact in light of the substantive law. *See Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. 2505.

"In evaluating whether a genuine issue of material fact exists, '[t]he evidence of the non-movant is to be believed.'" *Sim v. New York Mailers' Union Number 6,* 166 F.3d 465, 469 (2d Cir.1999) (quoting *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. 2505), and "a court must resolve all ambiguities, and draw all reasonable inferences, against the moving party." *McNeil,* 831 F.Supp. at 1082 (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (*per curiam*) and *Donahue v. Windsor Locks Bd. of Fire Commr's.,* 834 F.2d 54, 57 (2d Cir. 1987)). "Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted." *Cruden v. Bank of New York,* 957 F.2d 961, 975 (2d Cir.1992) (quoting *H.L. Hayden Co. of New York, Inc. v. Siemens Med. Sys., Inc.,* 879 F.2d 1005, 1011 (2d Cir.1989)).

## BACKGROUND

On or about May 20, 1998, plaintiff's father, Joseph E. Anderson (referred to herein as "Anderson, Sr.," to distinguish father from son), bought from the Bradlees store in Ramsey, New Jersey, a circular trampoline, thirteen feet in diameter, which was manufactured by Hedstrom. (Complaint at 2; Deposition of Joseph E. Anderson ("Anderson, Sr.Dep."), attached to Affirmation of David L. Lewittes ("Lewittes Aff."), Ex. 2 at 5–15.) Anderson, Sr.

brought the trampoline to his home in Rockland County, New York, (Complaint at 2, ¶ 6.) After reading the manual that came with the trampoline, Anderson, Sr. assembled the trampoline according to the instructions contained therein. (Anderson, Sr. Dep. at 17.) At one point plaintiff, who was twenty-four years old and who lived in his father's house, watched part of the assembly process briefly before leaving to go to work. (*Id.* at 32; Plaintiff's Dep. at 24). Plaintiff remembers putting some bolts together (Plaintiff's Dep. at 23), though his father only remembers plaintiff watching the process for a while. (Anderson, Sr. Dep. at 32.) Anderson, Sr. then let his three other children, ages 5, 8, and 14, and two or three other young neighborhood children use the trampoline. (*Id.* at 19–20, 23.) Before the first child got on the trampoline, Anderson, Sr. cautioned her not to do any somersaults (*id.* at 21), because "that was one of the things in the cautions that [it] said not to do." (*Id.* at 22.) The children stayed on the trampoline for fifteen or twenty minutes before getting off (*id.* at 23); during that time Anderson, Sr. stayed right next to the trampoline. (*Id.* at 27.) Then Anderson, Sr. told the children to get off the trampoline so he could go inside. (*Id.* at 28–29.) He told the children to stay off the trampoline while he was gone, and told them that no one was allowed to use it unless he or his wife was there. (*Id.* at 29.)

Shortly thereafter plaintiff returned home, and talked his father into going out with him to jump on the trampoline. (*Id.* at 34.) Plaintiff had never been on a trampoline before, with the possible exception of one time, which may or may not have been a dream, when he was less than five years old. (Deposition of [Plaintiff] Joseph C. Anderson ("Plaintiff's Dep."), attached to Lewittes Aff. Ex. 1 at 14; Affidavit of [Plaintiff] Joseph C. Anderson ("Plaintiff's Aff.") at 1.) Plaintiff had a vague memory that his parents had previ-

ously refused to get a trampoline for his sister because they thought it was dangerous (Plaintiff's Dep. at 19), but plaintiff's "notion about the dangers of the trampoline," according to his affidavit submitted with this motion, "was that they could be dangerous if you did somersaults or flips." (Plaintiff's Aff. at 4.) Plaintiff testified in his affidavit that when he decided to jump on the trampoline, he thought of it as a toy to be used by his younger brother and sisters. (Plaintiff's Aff. at 2.)

Anderson, Sr. jumped on the trampoline for about a minute and then got off. (*Id.* at 34–37.) After that, Anderson, Sr. recalls, plaintiff got on the trampoline, bounced a few times, and then got off by sitting down on the edge and reaching his feet to the ground. (*Id.* at 37–39). Plaintiff's father remembers staying next to the trampoline while plaintiff was on it. (*Id.* at 40.) There is some uncertainty in Anderson, Sr.'s mind as to whether plaintiff's first use of the trampoline actually occurred immediately after Anderson, Sr.'s own use of the trampoline—and therefore *before* neighbor Katherine Flagg ("Flagg") came over and jumped on it—or just *after* Flagg's first session on the trampoline; but Anderson, Sr.'s best recollection is that plaintiff used the trampoline before Flagg used it. (*See* Anderson, Sr. Dep. at 37–39). An acquaintance named Kevin Barrett, who came to the Anderson residence with Flagg, does recall seeing plaintiff on the trampoline as they approached the house (Deposition of Kevin Barrett ("Barrett Dep."), attached to Lewittes Aff., Ex. 4 at 11), but Barrett testified in his deposition that he believes that, as a result of a past bout of encephalitis, he may have a memory condition that affects his ability to remember fine detail. (*Id.* at 6–8.) Flagg did not see plaintiff jump on the trampoline before she got on. (Deposition of Katherine Flagg ("Flagg Dep"), attached to Lewittes, Aff., Ex. 3 at 9, 11, 15). As for plaintiff,[1] he only remembers jumping

---

1. Although there is no indication that plaintiff has any general memory problems, it appears

from his deposition testimony that his recol-

on the trampoline once that evening, and does not remember seeing either his father or Flagg jumping on it. (Plaintiff Aff. at 2.)[2]

In any event, while plaintiff and his father were at the trampoline, Katherine Flagg, a woman in her thirties or forties, stopped by to talk. Flagg used the trampoline for a short time (between two and five minutes) and then got off, and plaintiff got on. (Anderson, Sr. Dep. at 37–38, 41–42; Flagg Dep. at 16–17.)

Plaintiff states in his affidavit that "when I got on this trampoline it looked big to me, and I did not think it would be dangerous to jump other than in the center of the trampoline. I do remember having trouble staying in the center and for that reason I was not jumping hard or high." (Plaintiff's Aff. at 2.) He did not "notice anything in the way of a label or words that appeared on the surface of the trampoline," and said that there was no writing or labeling there "that really jumped out at me, no." (Plaintiff's Dep. at 25.) Flagg also testified during her deposition that she did not recall seeing any label or writing or language on the trampoline itself (Flagg Dep. at 16),[3] although Anderson, Sr., who assembled the trampoline, remembered seeing a label on either end of the trampoline's jumping surface. (Anderson, Sr. Dep. at 27–28.) He recalled that the label said "Caution." (Id.) In their submissions to this Court, defendants contend that on the "bed" or jumping surface of the trampoline were two identical labels, one directly across from the other, saying,

> **WARNING!** MISUSE AND ABUSE OF THIS TRAMPOLINE IS DANGEROUS AND CAN CAUSE SERIOUS INJURIES.

---

lection of the time immediately prior to his injury is somewhat limited.

2. There are similar uncertainties (see below) about the exact order in which Flagg and plaintiff jumped on the trampoline in the few minutes after her arrival and before his injury.

DO NOT DO SOMERSAULTS

DO NOT LAND ON NECK OR HEAD

PERMIT ONLY **ONE** PERSON AT A TIME ON THIS TRAMPOLINE. MORE THAN ONE PERSON AT A TIME ON THIS TRAMPOLINE INCREASES THE CHANCE OF INJURY.

**WARNING!**

1) MISUSE AND ABUSE OF THIS TRAMPOLINE IS DANGEROUS AND CAN CAUSE SERIOUS INJURIES.

2) READ INSTRUCTIONS BEFORE USING THIS TRAMPOLINE.

3) INSPECT BEFORE USING AND REPLACE ANY WORN DEFECTIVE OR MISSING PARTS.

4) THE SURFACE OF THE BED **MUST** BE DRY. **DO NOT** USE WHEN WET.

5) FOR USE BY ONE PERSON WEIGHING LESS THAN 250 LBS.

6) THIS PRODUCT IS RECOMMENDED FOR AGES 6 AND UP.

(See Defendants' Statement of Undisputed Material Facts, annexed to Lewittes Aff., at 5; Affidavit of Patrick Welsh ("Welsh Aff."), annexed to Lewittes Aff., at 2–3, ¶ 6, and Ex. C thereto (black and white copies of labels): Reply Affirmation of David I. Lewittes ("Lewittes Reply Aff.") at I, and Ex. A thereto ("original," colored version of same labels—collectively. "Def. Label Submissions") (boldface in original label)). The version of this label submitted to the court as the "original," in the Lewittes Reply Affidavit at Ex. A, measures approximately one and three-quarters inches high and eight inches wide. Plaintiff apparently does not dispute that

3. "Q: Did the trampoline itself have any label or writing or language on it that you saw? A: At that time I don't recall." (Flagg Dep. at 16.)

this is the label that was on the trampoline bed.[4]

Plaintiff bounced for a total of between three and ten minutes after Flagg's arrival on the scene. (Anderson, Sr. Dep. at 45 (ten minutes total time spent on trampoline after Flagg arrival); Flagg Dep. at 25–27 (not more than three to four minutes total time for two jumping sessions)). In addition to bouncing on his feet, plaintiff also bounced down into a sitting position and up again onto his feet, as he had seen Flagg do, and as she was now instructing him to do. (Flagg Dep. at 22; *see also* Plaintiff's Aff. at 3–4 ("The only thing I did on this trampoline was jump up and down and I remember sitting down and bouncing up."))[5] During this period, Anderson, Sr., Flagg, and Kevin Barrett were standing around the trampoline. (Anderson, Sr. Dep. at 45; Flagg Dep. at 21.)

**4.** With regard to the "instructions" that were available to the user to read in response to the directive in the warning numbered 2 above, defendants also assert, without apparent dispute by plaintiff, that another slightly smaller label (containing the same warnings numbered 1–6 above) was on a leg of the trampoline, and that a different label, entitled "Trampoline Instructions," was sewn somewhere into the "frame pad." (It is not clear where this was located in relation to the jumping surface.) That third label, measuring approximately 5 inches by 8 inches, assertedly said the following:

 1) Permit only one person at a time on the trampoline.
 2) Do not attempt somersaults. Most serious injuries occur during somersaults.
 3) Focus your eyes on the trampoline.
 4) Avoid bouncing too long.
 5) Stop your bounce by flexing your knees as your feet come in contact with the trampoline bed.
 6) Climb on and off the trampoline; do not jump.
 7) Learn fundamental bounces and body positions thoroughly before trying more advanced skills.
 8) Avoid bouncing too high.
 9) Do not use the trampoline as a springboard to other objects.
 10) Use trampoline only with mature, knowledgeable supervision.
 11) Keep objects away that could interfere with the performer.

After plaintiff had been jumping for a couple of minutes, Flagg saw him "go off center of the trampoline and then I saw him being propelled off." (Flagg Dep. at 25, 26.) At that time, Flagg remembers, "there was a car parked on the side of the road and [plaintiff] sort of used that to stop his forward motion" by putting his hands out, taking a few steps, slowing down and stopping with his hands against the car. (*Id.* at 28–30.) Plaintiff has no memory of this event (Plaintiff's Aff. at 2.), and Anderson, Sr. makes no reference to it in recounting the events of that day in his deposition.[6] According to Flagg, plaintiff, who did not appear to be injured, got back on the trampoline (Flagg. Dep. at 29–30), although it is not clear from Flagg's testimony whether that took place immediately after he was propelled off or after Flagg first took another opportunity to bounce for a very short time. (*Id.* at 30–34.)[7]

 12) Do not use the trampoline when under the influence of alcohol or drugs.
 13) For equipment information, contact the manufacturer.
(Def. Label Submissions, *id.*) Defendants also point to the existence of certain instructions in the Owners' Manual that came with the trampoline, but there is no evidence of any notice on the trampoline to notify the *user* that such a manual exists.

**5.** Flagg also remembers plaintiff following her instructions to land on his knees and then back on his feet two or three times. (Flagg. Dep. at 22.)

**6.** Barrett testified at deposition that, after one period of bouncing on the trampoline, plaintiff "came off—if I remember rightly, he came off the trampoline in what appeared to be an unintentional way and landed on the ground." (Barrett Dep. at 14–15.) He thought it was unintentional "because it happened suddenly," but he could not remember exactly how plaintiff landed. (*Id.*) Barrett was under the impression, as he related that event in the deposition, that it happened before Flagg first bounced on the trampoline. However, elsewhere in the deposition he stated that Flagg's memory, including the details that Flagg recalled, "was better than any own, was fuller than my own." (*Id.* at 38.) He added, "But there were certain points that she recalled that I also remembered distinctly." (*Id.*)

On his return to the trampoline, plaintiff bounced for only "a couple of minutes." (*Id.* at 33.) In the first one or two jumps, Flagg says that plaintiff may have jumped into a sitting (or knee-down) and then standing position, but then he returned to simple jumping up and down, facing Flagg, without turning his body. (*Id.* at 33–34.) Asked whether plaintiff was bouncing in "a controlled manner, or in an uncontrolled manner," Barrett, who had watched people on trampolines before, replied that he was bouncing "in a fairly typical manner" (Barrett Dep. at 19), and "generally speaking towards the central [sic]" rather than the sides. (*Id.* at 22.) At one point, however, according to Flagg, plaintiff "got off center," and "very shortly after he got off center he was basically launched off the trampoline. I would say at the most maybe two or three jumps before once [sic] he was off center that he was propelled off." (Flagg Dep. at 35.) Barrett, in describing the event, reported that once plaintiff got on the trampoline, "he bounced 6, maybe 7 times, and suddenly and unexpectedly launched off the surface of the trampoline on to the ground." (Barrett Dep. at 16.) Flagg remembers seeing plaintiff "being sort of sideways as he was going off the trampoline.... I just remember his body being completely off balance." (Flagg Dep. at 39.) In response to questioning about whether plaintiff jumped off the trampoline head first, Flagg replied, "I don't think he jumped head first. I literally think he was launched off it. He

definitely did not jump off that trampoline." (*Id.* at 48.) Similarly Barrett, when asked if plaintiff intentionally jumped off, replied, "No. He appeared to come off the trampoline very unexpectedly." (Barrett, Dep. at 23.) Plaintiff himself said, "it was kind of hard to stay in the middle.... I wasn't on it for more than a couple of minutes, and when I went to the side I wasn't able to come back. I went off the side.... It wasn't like I was getting closer to the side. I went from the middle to the side and then off." (Plaintiff's Dep. at 36.) Asked whether he was trying to go off, plaintiff replied, "No." (*Id.*).

Plaintiff landed within a couple of feet of Flagg, Barrett, and Anderson, Sr., "on the ... side of his body, sort of on his head and his neck." (Flagg Dep. at 37.) After landing, plaintiff's body remained still; he attempted to lift his head, which resulted in "a small movement, after which his head returned to the ground, and he said to his father, words to the effect that I'm unable, I can't feel anything. I can't remember the exact words, but it was clear that he couldn't move." (Barrett Dep. at 25; *see also* Flagg Dep. at 37.)

Anderson, Sr. did not see plaintiff's fall; he turned around to see plaintiff on the ground. (Anderson, Sr. Dep. at 46.) He said to his son, "Come on, Fred, get off the ground,"[8] and plaintiff replied "I can't" (*Id.* at 47.) An ambulance was called, and plaintiff was taken to a hospital. (*Id.* at 48 *et seq.*) It is undisputed that, as a result

7. At page 29 of her deposition, Flagg was asked "What if anything happened after [plaintiff] came down and landed?", and she answered, "He got back on the trampoline." She was then asked "So this was for a second time?", and she answered. "Yes." However, on page 30, after being asked about the same event (plaintiff being propelled off and landing against the car), she was asked. "What happened next? You got on the trampoline again?", and she answered "Yes." Then, on page 32–33, she described plaintiff getting back on the trampoline *after* her own second time on it, and when the questioner asked, "So now Joseph Anderson Jr. was on the

trampoline for a second time? Is that?", she answered "Yes." (Flagg Dep. at 29–33; *see also id.* at 63 (Q:"After the first time [plaintiff] was propelled off the trampoline you got on the trampoline again, correct?" A: "Yes." )) Anderson, Sr. apparently did not see or does not remember plaintiff falling off the trampoline at all before the fall in which he was injured (Anderson, Sr. Dep. at 44–47), and as noted, plaintiff does not remember the first fall at all.

8. Plaintiff's father generally called plaintiff "Freddy." (Anderson, Sr. Dep. at 16.)

of the impact of his fall from the trampoline, plaintiff is now a quadriplegic.

## DISCUSSION

Plaintiff brings three causes of action against defendants, based upon strict liability, negligence, and breach of implied warranties.

Under the strict liability cause of action, plaintiff alleges that the trampoline was unreasonably dangerous by reason of both (1) design defects and (2) a failure by defendants to warn of the known dangers that did exist. Specifically, plaintiff claims that the circular-design trampoline sold for family fun is inherently dangerous and unsuitable for recreational use by the general public, and that safer alternatives in the form of an attachable safety cage or a "unitized" trampoline-and-cage design were available (the safety cage was already on the market, and the "unitized" version was already in planning by Hedstrom), but these safety options were neither incorporated into Hedstrom's existing trampoline, nor offered by defendants to buyers for purchase as an option, at the time Anderson, Sr. made his purchase. Plaintiff also claims that the product was defective in that it was unsafe for jumping on any part but the center, yet it contained no center markings to assist the jumper in staying in the safe center zone. In addition, he claims that the shipping carton, supportive documentation, and safety labels provided with the trampoline provided inadequate warnings about known dangers, such as the need to stay in the center while jumping, the extent of protective ground cover required, the risk and seriousness of potential injury, and the need for professional instruction to avoid such injury.

In his negligence cause of action, plaintiff claims negligence based upon (1) the design, manufacture, marketing, advertising and distribution of the trampoline, (2) inadequate warnings, and (3) the omission of a center marking. He claims that the defendants knew or should have known both that the product as designed and marketed was not reasonably safe for its intended use, and that a safer design was available, yet they offered the product for sale without offering the safer options (such as a safety cage or center marking), and without providing sufficient warning of the dangers that did exist or the steps that could or should have been taken to reduce them. These actions and omissions, the plaintiff asserts, violated the defendants' duty of care. In regard to Hedstrom in particular, plaintiff adds particularized allegations and evidence that Hedstrom knew of the risk of serious injuries such as his, of the availability of a safety cage, and of the cage's ability to reduce such injuries. He also charges that Hedstrom knew about the need for safety instruction, center markings, and specific ground coverings to reduce such injuries, yet failed to provide either the appropriate warnings or the necessary markings to prevent or reduce the injuries.

Finally, in his breach of implied warranties claim, plaintiff charges (1) that the defendants knew or should have known that the plaintiff was relying on them to provide a product that was safe and suitable for use in the backyard environment, (2) that the trampoline was not safe for its intended use, and (3) that the product's lack of safety, together with plaintiff's reliance on defendants' implied warranties of fitness and merchantability, proximately caused his injuries.

Defendants move for summary judgment on four grounds. They argue (1) that plaintiff assumed the risk of the injuries he suffered, and therefore cannot state a cause of action against them; (2) that he has failed to present evidence sufficient to establish a failure to warn by the defendants; (3) that he has failed to put forth evidence which would support a *prima facie* case of a design defect in the trampoline; and (4) that even if plaintiff did arguably present evidence sufficient to establish either a failure to warn or a design defect, neither of those alleged defi-

ciencies proximately caused plaintiff's injuries. They argue that these alleged deficiencies preclude plaintiff's strict liability claims, and that on that basis they also preclude the negligence and breach of implied warranty claims. (*See* Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Defendants' Mem.") at 6; *see also id.* at 21 n. 10.)

## I. Assumption of the Risk

■ A federal court sitting in diversity must follow the law directed by the highest court of the state whose law is applicable to the resolution of the dispute. *Plummer v. Lederle Laboratories,* 819 F.2d 349, 355 (2d Cir.), *cert. denied,* 484 U.S. 898, 108 S.Ct. 232, 98 L.Ed.2d 191 (1987). When the highest state court has not ruled directly on the issue presented, a federal court must make its best estimate as to how the state's highest court would rule in the case. *Francis v. INA Life Ins. Co. of New York,* 809 F.2d 183, 185 (2d Cir.1987). In making that determination, the federal court is free to consider all the resources the highest court of the state could use. *Id.* "'A federal court may discern the forum state's law by examining relevant decisions from a forum state's inferior courts, decisions from sister states, federal decisions and the general weight and trend of authority.'" *Allstate Ins. Co. v. American Transit Ins. Co.,* 977 F.Supp. 197, 200 (E.D.N.Y.1997) (quoting *Continental Casualty Company v. Pullman, Comley, Bradley & Reeves,* 709 F.Supp. 44, 46 (D.Conn.1989)), *aff'd,* 929 F.2d 103 (2d Cir.1991)).

It is not disputed that New York law governs in this case. Therefore, I will apply the law of New York, following the decisions of the Court of Appeals on those issues that have been considered by the court, and making the best possible estimate of how that court would rule in those instances where direct authority is absent.

### A. Assumption of the Risk as a Defense Against Negligence Claims

Defendants argue that, under New York law, "an average adult assumes the risk of jumping on a trampoline," and that this assumption of the risk negates any duty which might otherwise have been owed to him or her by defendants. (Defendants' Mem. at 10.)

■ Several New York cases have undertaken an extensive analysis of the doctrine of assumption of the risk in light of New York's comparative negligence statute, N.Y.C.P.L.R. 1411, which provides that assumption of the risk is no longer an absolute defense. In *Lamey v. Foley,* 188 A.D.2d 157, 594 N.Y.S.2d 490 (4th Dep't 1993), the Appellate Division, Fourth Department, synthesized the state of the law with regard to this doctrine, basing that synthesis primarily on an analysis of decisions expounded or affirmed by the New York Court of Appeals. The court stated,

Care must be taken to distinguish between two distinct doctrines of assumption of risk. The first is embraced within the CPLR article 14–A concept of "culpable conduct attributable to the claimant" (CPLR 1411). It is akin to comparative negligence; it does not bar recovery, but diminishes recovery in the proportion to which it contributed to the injuries (CPLR 1411). We are here concerned with another category of assumption of risk, sometimes called "primary" assumption of risk (see, *Turcotte v. Fell,* 68 N.Y.2d 432, 438, 510 N.Y.S.2d 49, 502 N.E.2d 964 [1986]). If applicable, the doctrine of primary assumption of risk is not a measure of plaintiff's comparative fault, but a measure of the defendant's duty of care. Primary assumption of risk eliminates or reduces the tortfeasor's duty of care to the plaintiff and, in the former case, constitutes a complete bar to recovery, notwithstanding CPLR 14–A. Primary assumption of risk may be express or implied. The doctrine is frequently applied, or sought to be applied, to claims of injury arising out of a plaintiff's participation in a sporting or entertainment event or activity.

*Lamey*, 188 A.D.2d at 162–63, 594 N.Y.S.2d 490 (additional internal citations omitted). As the Court of Appeals has explained (albeit in the context of determining the duty of care owed by a professional jockey and the proprietor of a racetrack to another professional jockey injured in a professional race),

> while the determination of the existence of a duty and the concomitant scope of that duty involve a consideration not only of the wrongfulness of the defendant's action or inaction, they also necessitate an examination of plaintiff's reasonable expectations of the care owed him [or her] by others. This is particularly true in *professional* sporting contests, which by their nature involve an elevated degree of danger. If a participant makes an *informed* estimate of the risks involved in the activity and willingly undertakes them, then there can be no liability if he [or she] is injured as a result of those risks.... Accordingly, the analysis of care owed to plaintiff [in this context] must be evaluated by considering the risks plaintiff assumed when he elected to participate in the event and how those assumed risks qualified defendants' duty to him.... If the risks of the activity are fully comprehended or perfectly obvious, plaintiff has consented to them and defendant has performed its duty.

*Turcotte*, 68 N.Y.2d at 437–39, 510 N.Y.S.2d 49, 502 N.E.2d 964 (emphasis added).[9]

■ The applicability of the assumption of the risk doctrine depends on the nature and scope of the participant's awareness and consent. *Lamey*, 188 A.D.2d at 163, 594 N.Y.S.2d 490. The Court of Appeals has clarified that standard by stating,

As a general rule, participants properly may be held to have consented, by their participation, to those injury-causing events which are known, apparent or reasonably foreseeable consequences of the participation.... The question of whether the consent was an informed one includes consideration of the participant's knowledge and experience in the activity generally. Manifestly a professional athlete is more aware of the dangers of the activity, and presumably more willing to accept them in exchange for a salary, than is an amateur.

*Turcotte*, 68 N.Y.2d at 439–40, 510 N.Y.S.2d 49, 502 N.E.2d 964. Correspondingly, a defendant has a duty to exercise reasonable care to protect athletic participants from "unassumed, concealed or unreasonably increased risks." *Benitez v. New York City Bd. of Educ.*, 73 N.Y.2d 650, 657, 543 N.Y.S.2d 29, 541 N.E.2d 29 (1989).

■ Finally, to establish assumption of the risk by a plaintiff, the burden is on the *defendant* to show

> that plaintiff was aware of the defective or dangerous condition and the resultant risk.... Whether it can be concluded that a plaintiff made an informed estimate of the risks involved in an activity before deciding to participate depends on the openness and obviousness of the risk, plaintiff's background, skill, and experience, plaintiff's own conduct under the circumstances, and the nature of defendant's conduct.

*Lamey*, 188 A.D.2d at 164, 594 N.Y.S.2d 490 (citing *Benitez*, 73 N.Y.2d at 657–59, 543 N.Y.S.2d 29, 541 N.E.2d 29; *Turcotte*, 68 N.Y.2d at 440, 442, 510 N.Y.S.2d 49, 502 N.E.2d 964; *Maddox v. City of New York*, 66 N.Y.2d 270, 277, 496 N.Y.S.2d 726, 487

---

**9.** I note that the New York cases cited by the parties in their briefs generally address negligence claims against defendants who are either coparticipants in, or owners, operators, or supervisors of, sports facilities or events (often but not always professional), or, in some cases, individuals such as private homeowners. No cases have been cited, nor has

this Court found any, that specifically address the differences in a defendant's duty, and therefore in a plaintiff's assumption of risk, that might apply in the case of a negligence action against a *product manufacturer or retailer.* (I will discuss below the New York case law regarding assumption of the risk in the context of strict product liability).

N.E.2d 553 (1985)). An important factor is whether the risk is inherent in the activity; a plaintiff will not be held to have assumed those risks that are not inherent, i.e., not "ordinary and necessary" in the sport. *Turcotte,* 68 N.Y.2d at 433, 510 N.Y.S.2d 49, 502 N.E.2d 964 (citing *Cole v. New York Racing Assn.,* 24 A.D.2d 993, 994, 266 N.Y.S.2d 267 (2nd Dep't 1965), *aff'd,* 17 N.Y.2d 761, 270 N.Y.S.2d 421, 217 N.E.2d 144 (1966)). The issue of assumption of risk is generally a question of fact for the jury, although where the facts are not in dispute, it may be decided as a matter of law. *Maddox v. City of New* York, 66 N.Y.2d 270, 279, 496 N.Y.S.2d 726, 487 N.E.2d 553 (1985).

■ Defendants cite to two New York cases, *Liccione v. Gearing,* 252 A.D.2d 956, 675 N.Y.S.2d 728 (4th Dep't 1998), *appeal denied,* 92 N.Y.2d 818, 685 N.Y.S.2d 420, 708 N.E.2d 177 (1999), and *Williams v. Lombardini,* 38 Misc.2d 146, 238 N.Y.S.2d 63 (N.Y.Sup.Ct.1963), to demonstrate that, under New York law, a court can find assumption of the risk as a matter of law in a trampoline case. However, the facts in those cases—which were neither affirmed nor reversed by the Court of Appeals and therefore may not be dispositive of the position that would be taken by New York's highest court—differed in significant respects from those in the case at bar.

First, those negligence actions were brought, in one case, against the owner of a private backyard trampoline (and of the private home on whose grounds it was located), and in the other case against the

operators of an ice cream stand who maintained trampolines behind their stand for the use of their customers. Since the question of assumption of the risk is so intimately related to the duty of care owed by the defendant, and operates to qualify a defendant's existing duty to the plaintiff, *Turcotte,* 68 N.Y.2d at 438, 510 N.Y.S.2d 49, 502 N.E.2d 964, particular scrutiny is required when applying a finding based on a homeowner's or amateur facility-owner's duty of care to the very different duty of care owed by a product manufacturer or retailer to foreseeable users of the product. *See Lamey,* 188 A.D.2d at 167, 594 N.Y.S.2d 490.[10]

Second, in each of the cases cited by defendants, the plaintiff's behavior, and the warnings the plaintiff was given about the possible consequences of his or her behavior, also differed significantly from the facts in this case. In *Liccione,* the plaintiff admitted engaging in double-jumping on the trampoline[11]—an intentional activity that is arguably more hazardous than the jumping engaged in by plaintiff in this case—despite the presence of a warning sign on the trampoline specifically directing users not to engage in double-jumping because it increased the danger of being bounced off the trampoline. (*See* Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Plaintiff's Mem.") at 2–4: *Liccione* Appendix, Brief for Defendant–Appellants Thomas Gearing, Sr. and Thomas Gearing, Jr. ("Gearing Brief") at 7–8; *Liccione* Record on Appeal at 305.)[12] In addition, one

**10.** The *Lamey* decision held at one point that "[t]he doctrine of primary assumption of the risk is not a defense to a products liability claim." *id.,* 188 A.D.2d at 165, 594 N.Y.S.2d 490, but a thorough reading of subsequent language in the opinion reveals that this conclusion addresses only *strict liability* claims, not claims sounding in negligence. Nevertheless, the policies articulated in the opinion, which explain why manufacturers and retailers are held to a higher standard of care, demonstrate why assumption of the risk defenses should be evaluated differently in claims against homeowners or facility owners

than in claims against manufacturers and retailers, even in a negligence case.

**11.** Double-jumping refers to the practice of having two or more users bouncing at the same time.

**12.** Defendants, believing that the *Liccione* case is highly relevant to this one, have submitted over a thousand pages of the record of that case to the Court. The undersigned has summarily reviewed that record, and is satisfied that significantly differing facts distinguish it from the case at bar. I note that

of the individual defendants in *Liccione* claimed he had told plaintiff to read the warning signs. (Plaintiff's Mem. at 3; Jumpking Reply Brief of 1–2.) Thus, the question of what the *Liccione* plaintiff actually knew, or should be charged with knowing, about the dangers of the specific higher-risk activities in which she engaged, differs from the corresponding set of questions in this case. In this case, the only allegations of arguably incorrect, "high risk," or culpable behavior by the plaintiff that have been put forth by defendants are, first, that plaintiff bounced off-center on the trampoline [13]—an act which was not prohibited, warned against, or declared dangerous by any sign on the trampoline, which the plaintiff claims he did not know was dangerous, and which he further claims to have been totally unintentional and involuntary—and, second, that plaintiff got on again after being propelled off the trampoline once. Thus, because the activities in which this plaintiff engaged were arguably less risky than those engaged in by the *Liccione* plaintiff, as that risk was identified by the manufacturer's own warning signs, any risk that this plaintiff can be said to have assumed may reasonably be considered more limited than was the case in *Liccione*.[14] There was also evidence in *Liccione* that the plaintiff there was not a total beginner, but had used the trampoline before the date of injury (Gearing Brief at 4, 7), and that she was a skilled dancer (*see Liccione* plaintiff's R 59 *et passim*), and the court took her experience into consideration in its ruling on assumption of the risk. *See Liccione* 252 A.D.2d at 956, 675 N.Y.S.2d 728

(parties established that plaintiff was "of sufficient age, education and *experience* to assume the risks") (emphasis added). In addition, the educational factor of which the court took specific note varied between these cases; the *Liccione* plaintiff was a college student, while the plaintiff in this case never graduated from high school and has only a G.E.D. diploma. Thus, while the *Liccione* court did find that the plaintiff's specific factual circumstances were sufficient for the court to conclude that she had assumed the particular risk of her injury in that case, I cannot read that conclusion as a dispositive holding that, under New York law, all trampoline jumpers, no matter what activity they engage in, no matter what their education and experience level may be, and no matter what warnings are made available to them, assume the risk of quadriplegia as a matter of law.

Similarly, the *Williams* plaintiff admits to having read a posted notice and rules at defendants' trampoline site that stated, "Use trampolines at your own risk. We are not responsible for accidents" and "Do not attempt difficult tricks." *Williams*, 38 Misc.2d at 147, 238 N.Y.S.2d 63. He then intentionally performed a front flip or somersault, as a result of which he was thrown off balance and injured. Faced with this fact pattern, the *Williams* court stated that "where it indisputably appears that an ordinary prudent person would under the same or similar circumstances not have incurred the risk which plaintiff's conduct involved, then the question [of whether the risk was so obvious that plaintiff must

---

while defendants in that case disputed plaintiff's assertion that she had double-jumped with one of the defendants, claiming instead that she had jumped alone but on a wet surface, plaintiff herself admitted to the double-jumping; moreover, the warning sign also directed users not to jump on a wet surface, so either action would have been one that was specifically highlighted in the warning sign as dangerous.

**13.** *See, e.g.,* Defendants' Reply Memorandum at 1, which states, "it is undisputed that plain-

tiff's injuries were caused by his failure to bounce in the center of the trampoline, resulting in his falling from the trampoline."

**14.** I also note that the risk that the *Liccione* plaintiff was held to have assumed was that of an injury to her ribs and shoulder from falling onto the springs and frame, not the risk of permanent quadriplegia from a broken neck as the result of being propelled onto the ground.

have known and comprehended it] becomes one for the court," *id.*, 38 Misc.2d at 148, 238 N.Y.S.2d 63, and the court thus chose to decide the issue as a matter of law. The court then concluded, on the facts before it, that an individual of that plaintiff's age (nineteen), education and intelligence (a student at Yale University) "must be presumed to have foreseen that *when he propelled himself through the air in a forward flip or somersault* by means of this device, he ran the risk of landing either on the frame work or beyond in such a fashion as to cause injury.... The plaintiff here voluntarily assumed the obvious risk inherent *in the maneuver which he had undertaken." Id.*, 38 Misc.2d at 148–49, 238 N.Y.S.2d 63 (emphasis added).

By contrast, no sign disclaiming liability by either defendant existed in this case, and plaintiff did not attempt to perform a somersault or any similarly difficult maneuver. It is undisputed that at the time of his fall, plaintiff was simply jumping up and down in a fairly typical manner, and he has stated under oath that he believed the dangers of trampolines were confined to circumstances in which a user did somersaults or flips. In light of these factual differences, I cannot conclude, as did the *Williams* court on the facts before it, that "it indisputably appears that an ordinary prudent person would under the same or similar circumstances not have incurred the risk which plaintiff's conduct involved," *id.* at 148, 238 N.Y.S.2d 63, a conclusion on which that court relied to justify removing the decision from the province of the jury.

A review of case law from other jurisdictions supports the conclusion that the case should not be removed from the jury's determination. As defendants themselves acknowledge, while some courts in other states have found assumption of the risk by plaintiffs on the facts of particular trampoline cases (*see* Defendants' Mem. at 14, n. 6 (citing cases)), other courts have found genuine issues of fact as to whether the plaintiff had assumed the risk under the circumstances of the case, *see, e.g.,*

*Albritton v. Kiddie, Inc.*, 69 Ohio App.3d 708, 711, 591 N.E.2d 781 (1990), or as to whether the risks of jumping on a trampoline are "obvious" (an alternative basis for finding assumption of the risk under *Turcotte* ). *See, e.g., Bryant v. Adams*, 116 N.C.App. 448, 466, 448 S.E.2d 832 (1994), *review denied*, 339 N.C. 736, 454 S.E.2d 647 (1995); *Liesener v. Weslo, Inc.*, 775 F.Supp. 857, 861 (D.Md.1991) (both addressing obviousness of risk as a matter of law for purpose of determining whether warnings were necessary).

In the instant case, and applying existing New York law, I conclude that questions of fact exist as to whether plaintiff assumed the risk of his injury, and that a reasonable trier of fact could find in favor of the plaintiff on this question. The parties vigorously dispute the openness and obviousness of the risk of such serious injury to one who engaged in ordinary jumping—as well as the obviousness of the risk created by moving away from the center in the course of that jumping—and no New York case has been cited by the parties or found by the Court that directly holds that the dangers of jumping on a trampoline are, in all circumstances, obvious as a matter of law. Moreover, it is undisputed that plaintiff's background, skill, and experience were those of a complete novice, factors which the jury may appropriately include in its evaluation of what he understood of the general risks of trampolining and the specific risks of jumping off-center. In this regard, plaintiff has submitted an affidavit by an expert, supported by documentation, concluding that the defects or dangers associated with the trampoline are latent and would not be appreciated by the average trampoline user. Defendant has submitted no contrary evidence which would cause the Court to disregard plaintiff's submission. Thus, there is an issue of fact in this regard.

Adding to the question of what the plaintiff understood about the risks are the

questions raised by the plaintiff as to the adequacy of the posted warnings.[15] The appropriateness of plaintiff's own conduct under the circumstances is also a central issue of dispute. Defendants characterize plaintiff's jumping off-center as a knowing and voluntary decision whose risks were or should have been obvious to him, particularly after having been propelled off the trampoline once. By contrast, plaintiff characterizes it as an involuntary act the risks of which were not obvious, and which were not even understood by defendants' engineers who had designed the trampoline and overseen its manufacture and warnings. (Keegan Aff. at 8; Deposition of Francis Pavolko, Former Vice President of Manufacturing and V.P. of Quality Assurance ("Pavolko Dep."), in Affidavit of Mare A. Rabinoff, Ed. D. ("Rabinoff Aff."), Ex. 12 at 53–55, 61; Deposition of Michelle Lee Klingensmith, Products Engineer, in Rabinoff Aff., Ex. 13 at 32.) The nature and culpability of defendants' conduct—in choosing which warnings to display, in failing to mark the center of the trampoline, and in choosing to sell the trampoline without offering (or notifying purchasers of the availability of) a safety cage, despite their asserted knowledge of the trampoline's dangers and of the cage's ability to reduce them—is also in dispute.

For all these reasons, I conclude that plaintiff has raised a triable issue as to whether, under the facts presented here, he assumed the risk of his injuries, thereby relieving defendants of their duty of care to him. Defendants' motion to dismiss the negligence claims on this basis is therefore denied.

**15.** As will be discussed further below, there is a genuine and material factual dispute as to whether these warnings met the industry standard.

**16.** The court acknowledged, however, that "CPLR article 14-A assumption of risk, a species of comparative fault, is a valid defense to any action to recover damages for personal injury, including a products liability action." *Lamey, id.* at 166 n. 2, 594 N.Y.S.2d 490

## B. Assumption of the Risk as a Defense Against Strict Liability Claims.

Defendants argue that the assumption of the risk defense also provides a basis for granting summary judgment dismissing the strict liability claims. Plaintiff, citing *Lamey v. Foley,* 188 A.D.2d 157, 594 N.Y.S.2d 490 (4th Dep't 1993), responds that whether this Court finds assumption of the risk to be a matter of fact for the jury or a matter of law for the court with regard to the negligence claim, the defense of assumption of risk is not available to defendants with regard to the strict products liability claim.

In *Lamey,* the Appellate Division, Fourth Department, conducted a thorough review of the principles underlying the doctrine of assumption of the risk and the doctrine of strict products liability under New York law, and concluded that "the doctrine of primary assumption of the risk cannot constitute a defense to a claim of strict products liability." *Id.* at 166, 594 N.Y.S.2d 490.[16] Although I have concluded that assumption of the risk is an issue for the jury in this case, which would preclude dismissal of the strict liability claim on that ground even if assumption of the risk did provide a valid legal defense against a strict liability claim, I will nevertheless briefly address that argument here, because it is relevant to the issue of whether defendants may raise the defense before the jury with respect to the strict liability claim at trial. Both parties have argued the issue thoroughly in their briefs, and there is no reason to believe that any new information will be presented to the Court on this issue in the future; therefore

(citing *Voss v. Black & Decker Mfg. Co.,* 59 N.Y.2d 102, 106, 463 N.Y.S.2d 398, 450 N.E.2d 204 (1983) and *Codling v. Paglia,* 32 N.Y.2d 330, 342, 345 N.Y.S.2d 461, 298 N.E.2d 622 (1973) (holding manufacturer liable for defective product "provided that" plaintiff could not by exercise of reasonable care have discovered the defect and perceived its danger or otherwise averted his injury)).

it is appropriate to decide this legal issue now.

The *Lamey* decision was not appealed to the New York Court of Appeals, and this Court has not found any other decision by New York's highest court that addresses the applicability of the assumption of the risk doctrine to strict products liability. Nor has the Court been able to find any New York case contradicting the *Lamey* decision, or in fact addressing the issue at all. A review of case law from other states reveals courts that have adopted the same position as that taken by the *Lamey* court. *See, e.g., Larsen v. Pacesetter Systems, Inc.,* 74 Haw. 1, 37, 837 P.2d 1273 (1992), *as amended on rehearing by* 74 Haw. 650, 843 P.2d 144 (1992) ("we join those courts that have abolished primary implied assumption of risk in strict products liability and implied warranty actions for personal injury and have retained secondary implied assumption of risk solely as a form of contributory negligence to be compared against defendant's fault" (citing cases)); *Coney v. J.L.G. Industries, Inc.,* 97 Ill.2d 104, 111, 73 Ill.Dec. 337, 454 N.E.2d 197 (1983). While some other states do retain primary assumption of the risk as a defense against a strict products liability claim, the cases found by this Court in which a state's highest court takes such a position have been decided in the special context of the firefighter's rule, raising some question about their general applicability. *See, e.g., Mignone v. Fieldcrest Mills,* 556 A.2d 35, 41 (R.I.1989); *Armstrong v. Mailand,* 284 N.W.2d 343, 351–52 (Minn.1979).[17]

The *Lamey* court, in reaching its conclusion about the inapplicability of primary assumption of the risk in a strict products liability action, summarized the four primary rationales underlying strict products liability explicated in prior decisions of New York's Court of Appeals. The court explained that, first, the defendant, having invited and solicited purchase and use of its product with the unquestionable intention that the customer would rely upon the defendant's express assurance of its quality,

> "should not be permitted to avoid responsibility ... when the expected use leads to injury and loss." (*Codling v. Paglia,* 32 N.Y.2d [330] at 339, 345 N.Y.S.2d 461, 298 N.E.2d 622 [ (1973) ]. Second, "[i]n today's world, it is often only the manufacturer who can fairly be said to know and to understand when an article is suitably designed and safely made for its intended purpose...." (*Codling v. Paglia, supra,* 32 N.Y.2d at 340, 345 N.Y.S.2d 461, 298 N.E.2d 622). Third, the cost of injury can best be borne by those who make and sell defective products; they have the capacity to pass on their economic loss to those who purchase the products (*Codling v. Paglia, supra* at 341, 345 N.Y.S.2d 461, 298 N.E.2d 622). Fourth, through the imposition of strict liability, pressure is brought on the manufacturer to produce safer and more socially useful goods (*Codling v. Paglia, supra*). For the foregoing reasons, a "manufacturer is under a non-delegable duty to design and produce a product that is not defective" (*Robinson v. Reed–Prentice Div.,* [49 N.Y.2d 471] at 479, 426 N.Y.S.2d 717, 403 N.E.2d 440 [ (1980) ] ) and, in accordance with the public's expectations, must "stand behind" its goods that prove to be defective and injurious (*see, Sage v. Fairchild–Swearingen Corp.,* 70

---

**17.** I note that a lower appellate court in Minnesota did rely on this case to support a finding that primary assumption of the risk was applicable to strict products liability in a non-firefighter's context. *Andren v. White–Rodgers Co.,* 465 N.W.2d 102 (Minn.App. 1991).

Although the doctrine of assumption of the risk was applied in a strict products liability case in Iowa, see *Nichols v. Westfield Industries, Ltd.,* 380 N.W.2d 392 (Iowa 1985), the court clarified that the jury instruction in that case actually addressed secondary rather than primary assumption of risk, "because it ask[ed] the jury to find whether plaintiff acted unreasonably in assuming a particular risk." *Id.* at 399.

N.Y.2d 579, 585, 523 N.Y.S.2d 418, 517 N.E.2d 1304 [ (1987) ] ).

*Lamey,* 188 A.D.2d at 166–67, 594 N.Y.S.2d 490 (some internal citations edited or omitted). Having established the existence of the nondelegable duty and the rationales behind it, the court pointed out that

> [t]he doctrine of primary assumption of the risk, in contrast, is based on the plaintiff's consent, express or implied, to relieve the defendant of his [or her] duty of care in whole or in part.... Where primary assumption of risk is present, it does not merely diminish plaintiff's recovery, but eliminates or qualifies whatever duty defendant otherwise would owe to plaintiff in the circumstances. Thus, a claim of strict products liability and a defense of primary assumption of risk are in inherent conflict, and one must give way.

*Id.* at 167, 594 N.Y.S.2d 490 (internal citations omitted). It was on this basis that the court concluded that

> the defense of primary assumption of risk is not available to eliminate or reduce a manufacturer's duty to produce a nondefective product, even where the product's dangerous qualities are obvious to and appreciated by the user (see, *Micallef v. Miehle Co.,* 39 N.Y.2d 376, 383–87, 384 N.Y.S.2d 115, 348 N.E.2d 571 [ (1976) ] ). To allow a defendant to escape its nondelegable duty to make a safe product by invoking the implied consent of the product user would undermine the policies underlying the doctrine of strict products liability. It would erode a defendant's incentive to achieve safety in design and production and would sanction the marketing of dangerous products.

*Lamey, id.* at 167–68, 594 N.Y.S.2d 490 (internal citation omitted).

The analysis in *Lamey* is fully consistent with other New York cases on the doctrines of assumption of the risk and strict products liability. In addition, the inapplicability of the assumption of the risk doctrine in a strict products liability case is corroborated by one of the earliest and most well-known New York cases on assumption of the risk, *Murphy v. Steeplechase Amusement Co.,* 250 N.Y. 479, 166 N.E. 173 (1929) (Cardozo, C.J.). In that case, in which "Judge Cardozo framed the modern debate by articulating the pertinent tort policy and doctrine" pertaining to assumption of the risk by a participant in a sporting activity, *Morgan v. State of New York,* 90 N.Y.2d 471, 482–83, 662 N.Y.S.2d 421, 685 N.E.2d 202 (1997), the court held that "[o]ne who takes part in such a sport accepts the dangers that inhere in it so far as they are obvious and necessary, just as a fencer accepts the risk of a thrust by his [or her] antagonist or a spectator at a ball game the chance of contact with the ball." *Murphy,* 250 N.Y. at 482, 166 N.E. 173. Significantly, however, the court added.

> A different case would be here if the dangers inherent in the sport were obscure or unobserved, or so serious as to justify the belief that precautions of some kind must have been taken to avert them.... A different case there would also be if the accidents had been so many as to show that the game in its inherent nature was too dangerous to be continued without change....[,] that the game was a trap for the unwary, too perilous to be endured.

*Id.* at 483, 166 N.E. 173 (quoted in part in *Morgan,* 90 N.Y.2d at 483, 662 N.Y.S.2d 421, 685 N.E.2d 202). As I will discuss below, in addressing strict products liability, it is this kind of excessive danger or "defectiveness" in the product that a plaintiff must demonstrate to establish a claim of strict liability.[18] Only if a product is

---

18. Plaintiff's claim in this case that the product is not reasonably safe is based in large part precisely upon evidence of accidents that have been so numerous that they demonstrate that backyard trampolines are inherently too dangerous to be allowed on the consumer market without additional safety features (such as, for example, a safety cage).

"not reasonably safe," *Voss v. Black & Decker Manufacturing, Co.,* 59 N.Y.2d 102, 108, 463 N.Y.S.2d 398, 450 N.E.2d 204 (1983), will the defendant manufacturer or retailer be subject to a claim of strict liability. Therefore, according to the *Murphy* guidelines, a strict products liability action based on a product that is not reasonably safe would be a "different case" from one in which primary assumption of the risk applies, and should not be subject to application of the assumption of the risk principle.

Therefore, I find the *Lamey* court's conclusion—that primary assumption of the risk is not a defense in a strict products liability action—to be the logical statement of existing New York tort doctrine; and neither the defendants, nor ·this Court's own research, have identified any cases that effectively undercut the logic of that conclusion. Thus, my "best estimate," *Francis v. INA Life Ins. Co. of New York,* 809 F.2d 183, 185 (2d Cir.1987), is that New York's highest court would, if given the opportunity, rule in accordance with the conclusions of the *Lamey* court. I therefore conclude that primary assumption of the risk is not a defense to a claim of strict products liability under New York law, and consequently may not be raised before the jury at trial to bar defendants' liability under plaintiff's strict liability claim.

## II. Failure to Warn.

Plaintiff alleges, under both his negligence and strict liability causes of action, that defendants breached their duty to warn in at least five ways: (1) by not clearly warning of the potential seriousness of injury from the trampoline, (2) by not making clear the need to jump only in the center of the trampoline, (3) by not giving notice that a safety cage existed for use with the trampoline and that its use could substantially reduce the likelihood of injury, (4) by not sufficiently warning of the need for professional instruction (or, possibly, spotters) if such was necessary,

and (5) by not giving adequate warning of the depth (and perhaps the kind) of ground covering that should be placed around the trampoline to reduce the likelihood or severity of injury in the event of a fall. Defendants counter by claiming (1) that the dangers were so open and obvious that no warning was necessary under the law, (2) that in any event their warnings were adequate, and (3) that any failure to warn did not proximately cause plaintiff's injury because he failed to read the warnings that existed.

 "Where liability is predicated on a failure to warn, New York views negligence and strict liability claims as equivalent." *Martin v. Hacker,* 83 N.Y.2d 1, 8 n. 1, 607 N.Y.S.2d 598, 628 N.E.2d 1308 (1993) (citation omitted). In *Liriano v. Hobart Corp.,* 92 N.Y.2d 232, 677 N.Y.S.2d 764, 700 N.E.2d 303 (1998) (*"Liriano I"*), New York's Court of Appeals summarized the current state of New York law with regard to a manufacturer's liability for failure to warn in a products liability case:

A manufacturer who places a defective product on the market that causes injury may be liable for the ensuing injuries. A product may be defective when it contains a manufacturing flaw, is defectively designed or is not accompanied by adequate warnings for the use of the product. A manufacturer has a duty to warn against latent dangers resulting from foreseeable uses of its product of which it knew or should have known. A manufacturer also has a duty to warn of the danger of unintended uses of a product provided these uses are reasonably foreseeable.... [A] manufacturer may be liable for failing to warn against the dangers of foreseeable misuse of its product.... This Court has also recognized that, in certain circumstances, a manufacturer may have a duty to warn of dangers associated with the use of its product even after it has been sold. Such a duty will generally arise where a defect or danger is revealed by user

operation and brought to the attention of the manufacturer; the existence and scope of such a duty are generally fact-specific.... Compared to purchasers and users of a product, a manufacturer is best placed to learn about post-sale defects or dangers discovered in use. A manufacturer's superior position to garner information and its corresponding duty to warn is no less with respect to the ability to learn of ... misuse of a product....

*Id.,* 92 N.Y.2d at 237, 240–41, 677 N.Y.S.2d 764, 700 N.E.2d 303. It has long been established in New York that the duty to warn of dangers in the use of the product exists even though the product is perfectly designed and made. *Fane v. Zimmer, Inc.,* 927 F.2d 124, 128 (2d Cir.1991) (citing *Baker v. St. Agnes Hosp.,* 70 A.D.2d 400, 405, 421 N.Y.S.2d 81 (2d Dep't 1979) (inadequate warnings alone are enough to make a product unsafe)): *Rosebrock v. General Electric Co.,* 236 N.Y. 227, 238, 140 N.E. 571 (1923); *Alfieri v. Cabot Corp.,* 17 A.D.2d 455, 460, 235 N.Y.S.2d 753 (1962), *aff'd,* 13 N.Y.2d 1027, 245 N.Y.S.2d 600, 195 N.E.2d 310 (1963); 1A N.Y. PJI3d 563.

The standard for evaluating "failure to warn" liability is described by the Court of Appeals as "intensely fact-specific, including but not limited to such issues as feasibility and difficulty of issuing warnings in the circumstances; obviousness of the risk from actual use of the product; knowledge of the particular product user; and proximate cause." *Liriano I,* 92 N.Y.2d at 243, 677 N.Y.S.2d 764, 700 N.E.2d 303; *see also id.* at 240 n. 3, 677 N.Y.S.2d 764, 700 N.E.2d 303 (directing, in evaluating a post-sale duty to warn, the weighing of factors such as "the degree of danger the problem involves, the number of reported incidents, the burden of providing the warning, as well as the burden and/or ability to track a product post-sale") (citations omitted). The factual determination of whether an adequate warning was given is "often interwoven with the question of whether the defendant manufacturer has a duty to warn, and if so, *to whom that duty is owed.*" *Cooley v. Carter–Wallace Inc.,* 102 A.D.2d 642, 644, 478 N.Y.S.2d 375 (4th Dep't 1984) (emphasis added). In *Cooley,* the Fourth Department explained:

Theoretically, a consumer buys a product after evaluating the risks in its use. But the consumer is not on an equal footing with the manufacturer who is in a unique position to know the specific risks involved. The imposition of the duty to give a warning of some kind involves a balancing test which weighs the seriousness of potential harm to the consumer against the costs to the manufacturer. Since the cost of providing warnings is often minimal, the balance usually weighs in favor of an obligation to warn. Once a warning is given, the focus shifts to the adequacy of the warning.... Our courts have required ... that "[w]arnings must clearly alert the user to avoid certain [unsafe] uses of the product which would appear to be normal and reasonable" (*Lancaster Silo & Block Co. v. Northern Propane Gas Co.,* 75 A.D.2d 55, 65, 427 N.Y.S.2d 1009 [ (4th Dep't 1980) ], noting that "[t]he degree of danger is a crucial factor in determining the specificity required in a warning" ( [*id.* ] ) and that to be adequate, the warnings must be commensurate with the risk involved in the ordinary use of the product (*see McLaughlin v. Mine Safety Appliances Co.,* 11 N.Y.2d 62, 69, 226 N.Y.S.2d 407, 181 N.E.2d 430 [ (1962) ] ) ....

There are several important considerations that directly affect the adequacy of a warning, including the location and conspicuousness of the warning and the method in which the warning is communicated to the ultimate user (*see Cover v. Cohen,* [61 N.Y.2d 261,] 276, 473 N.Y.S.2d 378, 461 N.E.2d 864 [ (1984) ] ). Of critical importance is whether the warning sufficiently conveys the risk of danger associated with the product and is qualitatively sufficient to impart the particular risk of harm. Likewise, a warning may be inadequate when the

magnitude of the potential harm requires more. For example, ... [i]n *Little v. PPG Inds.* (19 Wash.App. 812, 579 P.2d 940 [ (Div. 2 1978) ], *affd. as mod,* 92 Wash.2d 118, 594 P.2d 911 [ (1979) ] ), a label containing the caution "vapor may be deadly" was deemed insufficient to convey the particular danger that may cause death. . . . The generally accepted rule, however, is that the reasonableness vel non of a set of warnings is a question of fact for the jury.

*Cooley,* 102 A.D.2d at 644–47, 478 N.Y.S.2d 375 (some internal citations and punctuation omitted).

The *Cooley* court added that, because of the equivalency of negligence and strict liability "failure to warn" theories under New York law, "one issue of fact typically precluding summary judgment in failure to warn cases is whether the information in the warning is commensurate with the manufacturer's knowledge of the nature and extent of the dangers from foreseeable use of its product." *Id.* at 648–49, 478 N.Y.S.2d 375. In determining what a manufacturer "knew or should have known" about such dangers, *Liriano I,* 92 N.Y.2d at 237, 677 N.Y.S.2d 764, 700 N.E.2d 303, the manufacturer is bound by law to keep abreast of scientific knowledge and advancements in the state of the art in the field. *Cover v. Cohen,* 61 N.Y.2d 261, 274, 473 N.Y.S.2d 378, 461 N.E.2d 864 [ (1984) ] (citing, *inter alia,* [1A N.Y. PJI3d 2:135 at 564, formerly] 1 N.Y. PJI2d 364–65).

■■■ Finally, a manufacturer may not be liable for a failure to warn if the risks were sufficiently obvious to the user without a warning. As the Court of Appeals has explained,

[A] limited class of hazards need not be warned of as a matter of law because they are patently dangerous or pose open and obvious risks. . . . . [W]hen a warning would have added nothing to the user's appreciation of the danger, no duty to warn exists as no benefit would be gained by requiring a warning. On the other hand, the open and obvious defense generally should not apply when there are aspects of the hazard which are concealed or not reasonably apparent to the user. . . .

While important to warning law, the open and obvious danger exception is difficult to administer. The fact-specific nature of the inquiry into whether a particular risk is obvious renders bright-line pronouncements difficult, and in close cases it is easy to disagree about whether a particular risk is obvious. It is hard to set a standard for obviousness that is neither under nor over-inclusive. *Because of the factual nature of the inquiry, whether a danger is open and obvious is most often a jury question.* Where only one conclusion can be drawn from the established facts, however, the issue of whether the risk was open and obvious may be decided by the court as a matter of law.

*Liriano I,* 92 N.Y.2d at 241–42, 677 N.Y.S.2d 764, 700 N.E.2d 303 (emphasis added).

### A. Defendants' Causation Argument.

Defendants argue that because plaintiff failed to read the warnings that did accompany the trampoline, his injury could not have been proximately caused by any alleged inadequacy in those warnings.

■■■ There is, in New York, a presumption that a user would have heeded warnings if they had been provided, and that the injury would not have occurred. *Power v. Crown Controls Corp.,* 149 Misc.2d 967, 969, 568 N.Y.S.2d 674 (N.Y.Sup.Ct.1990); 38 A.L.R.5th 683 (1996) (citing comment j to § 402(a) of the Restatement (Second) of Torts). The presumption can be rebutted by proof that an adequate warning would have been futile since plaintiff would not have read it. *Power, id.* However, it is the manufacturer who has the burden of proving that, even if adequately warned, the plaintiff would not have read the warnings and his

behavior would have been unchanged. Summary judgment is appropriate only when that burden has been met to the level of negating the existence of a genuine factual issue. *Hoffman–Rattet v. Ortho Pharmaceutical Corp.*, 135 Misc.2d 750, 751, 516 N.Y.S.2d 856 (N.Y.Sup.Ct.1987). In *Liriano v. Hobart Corp.*, 170 F.3d 264 (2d Cir.1999) (*"Liriano II"*), the Second Circuit confirmed the operation of this presumption in a "failure to warn" case and also confirmed the placement of the burden of rebuttal on the defendant. The court stated:

> We know, as a general matter, that the kind of negligence that the jury attributed to the defendant [failure to warn] tends to cause exactly the kind of injury that the plaintiff suffered [in that case, use of the meat grinder without a safety shield, and consequent injury]. Indeed, that is what the jury must have found when it ruled that Hobart's failure to warn constituted negligence. In such situations, rather than requiring the plaintiff to bring in more evidence to demonstrate that his [or her] case is of the ordinary kind, the law presumes normality, and requires the defendant to adduce evidence that the case is an exception. Accordingly, ... it is up to the defendant to bring in evidence tending to rebut the strong inference, arising from the accident, that the defendant's negligence was in fact a but–for cause of the plaintiff's injury. This shifting of the onus procedendi has long been established in New York.... *See Martin v. Herzog*, 228 N.Y. 164, 170, 126 N.E. 814 (1920) [Cardozo, J.].

*Liriano II*, 170 F.3d at 271–72.

■ In making the argument that plaintiff's failure to read the warnings in this case negates the existence of proximate cause, defendants rely on two cases that can fairly be said to stand for the opposite proposition. In the first, *Johnson v. Johnson Chemical Co., Inc.*, 183 A.D.2d 64, 588 N.Y.S.2d 607 (2d Dep't 1992), the Second Department analyzed the question of whether a plaintiff who did not read the warnings could prove causation between inadequate warnings and the plaintiff's injury. While the court did make the statement that defendants quote in their brief—that is, that "It is perhaps difficult to see how a consumer who admittedly does not read the labels on the products which he or she uses can reasonably claim to have been injured because the text of such a label did not give a sufficient warning," *Johnson*, 183 A.D.2d at 64, 588 N.Y.S.2d 607—the court concluded in its next sentence (which was not quoted by defendants) that:

> This argument loses its persuasive force, however, once it is understood that the intensity of the language used in the text of a warning is only one of the factors to be considered in deciding whether such warning is adequate. A second factor to be considered is the prominence with which such language is displayed. For example, ... [a] less intense warning, when displayed prominently in block letters on the front label of a product, may be ultimately more effective than [a] ... more intense warning, when displayed unobtrusively in small letters in the middle of a 10–page package insert. A consumer ... who, by [his or] her own admission, tends to ignore one sort of label, might pay heed to a different, more prominent or more dramatic label. The reasonableness of [his or] her behavior is for the jury to decide.

*Id.*

This position is in accord with the Fourth Department's conclusion in *Cooley* that the "location and conspicuousness" of a warning and "the method in which the warning is communicated to the ultimate user" directly affect the adequacy of a warning. *Id.*, 102 A.D.2d at 646, 478 N.Y.S.2d 375 (citing *Cover*, 61 N.Y.2d at 276, 473 N.Y.S.2d 378, 461 N.E.2d 864); *see also Baker v. St. Agnes Hosp.*, 70 A.D.2d 400, 402, 421 N.Y.S.2d 81 (2d Dep't 1979) (where doctor failed to read warning

in package insert and misused product, drug manufacturer could be held liable for its failure to "employ other, more effective means of communicating its warning.")

This line of reasoning is directly applicable to this case. For example, one of the defendants' claims is that the manufacturer did provide, on a page in the middle of its owner's manual, a warning related to the importance of jumping in the center of the trampoline. While plaintiff disputes whether the wording of this warning was adequate to effectively warn a reader of the importance of staying in the center, a jury could also reasonably conclude that the placement of such a warning in the middle of an *owner's* manual, rather than (for example) in bold letters on the trampoline itself, was insufficient to alert a *user* to the danger, either because there was no notice on the trampoline about the existence of such a manual or warning, or simply because the manufacturer, by putting it in a more obvious place, might have employed "other, more effective means of communicating its warning." I also note that plaintiff asserted in his Affidavit that he saw no warnings "that jumped out at me," and that "if there was a clear warning in bright colors as I understand there should have been, I believe that I definitely would have read the warning and followed it." (Plaintiff's Aff. at 3.) A jury could reasonably believe such a statement,[19] and if so could then reasonably conclude that any fault it found in location or conspicuousness was causally related to the plaintiff's injury.

Finally, plaintiff has submitted evidence, in the affidavit of his expert and accompanying documentation from the Consumer Product Safety Commission ("CPSC") (*see* Rabinoff Aff., Ex. 14 at ¶ 8), to support his argument that the warning labels should have taken a different graphic form— namely, the form proposed by the American National Standard for Product Safety Signs and Labels ("ANSI") rather than by the American Society for Testing and Materials ("ASTM"). Defendants have argued throughout their submissions that their warning labels are in accord with the standards proposed by the ASTM and that the warnings therefore meet the "industry standard." However, plaintiff asserts that the standards proposed by ANSI, rather than those proposed by ASTM, actually represent the industry standard, and that the ANSI standards are more stringent than the ASTM standards in several critical ways, including graphic design requirements. Although, as discussed *infra*, compliance with industry standards is only one factor to be weighed in determining the adequacy of a warning, this evidence nevertheless raises the issue of whether, had the alternate design been used, the plaintiff would have seen the labels and avoided the accident. This argument gains more weight in light of plaintiff's evidence that the CPSC supported an alternate design. While defendants have submitted color copies of the labels, showing that yellow and red coloring was used in their label design, this does not refute plaintiff's argument as a matter of law. Thus, the location and conspicuousness of the warnings (whether that be based on label or letter size, color, or other attributes of conspicuousness), and the role those factors played in the plaintiff's failure to read them, as well as the content and clarity of those warnings, are disputed issues in this case, and the plaintiff's failure to read the warnings should not, in and of itself, prevent the "failure to warn" claim from going before the jury. *See also Darsan v. Guncalito Corp.,* 153 A.D.2d 868, 870, 545 N.Y.S.2d 594 (2d Dep't 1989) (plaintiff's complaint that machine was defective by virtue of failure to "display with sufficient prominence" any warnings of the danger

---

**19.** This is true even though defendants have submitted proof that the warnings that were on the trampoline were in bright colors, but plaintiff nevertheless did not read them. The jury could conclude that a larger or more conspicuously-placed warning was appropriate and necessary, and that plaintiff would actually have read such warnings.

raises fact issue precluding summary judgment).[20]

The other case relied upon by defendants, *Power v. Crown Controls Corp.*, 149 Misc.2d 967, 568 N.Y.S.2d 674 (N.Y.Sup. Ct.1990)—a case in which the court rejected a manufacturer's summary judgment motion on a failure to warn claim—affirms this basis for allowing the claim to reach the jury, and also raises other grounds for allowing the cause of action to proceed. Although *Power* (a lower court case decided before *Johnson*) does cite to cases in other states supporting the proposition quoted by defendants—that "the inadequacy of the warning cannot have been a proximate cause of the accident if the plaintiff did not read the warning at all," *id.* at 969–70, 568 N.Y.S.2d 674—the *Power* court also immediately thereafter acknowledges several exceptions to that proposition, including the situation in which it is claimed that the warning label was not displayed with sufficient prominence.[21] Of particular interest is the additional exception upon which the court ultimately relied to decide that that case should go to the jury: the theory that "if a proper warning had been given, it could have come to the attention of officials of plaintiff's employer or perhaps even fellow workers, who could have informed plaintiff of what he had not personally read." *Id.* at 970, 568 N.Y.S.2d 674. The facts of the case before me seem to support such a theory equally well; that is, if a proper warning had been given, it could have come to the attention of plaintiff's father, or even Flagg or Barrett, who could have informed plaintiff of what he had not personally read.[22] Here, plaintiff's father has stated under oath that he read and followed the instructions in the safety manual, and that he also saw labels on the trampoline itself, but came away with only the impression of the word "caution"

**20.** Defendants have also cited to *Carbone v. Alagna,* 239 A.D.2d 454, 658 N.Y.S.2d 48 (2d Dep't 1997), to establish that a plaintiff's failure to read warnings can preclude a cause of action for failure to warn. Although the court in that case did conclude that, under the facts presented, the defendants were not liable under a failure to warn theory as a matter of law, the plaintiff's failure to read the warnings was only one of three factors that together led to the court's conclusion. The other two were that the dangers of injuring a person by shooting him with a slingshot are so obvious that they can be appreciated by a consumer to the same extent that a formal warning would provide, and that nevertheless the product did carry warnings not to aim the slingshot at people. In this case, as I discuss *supra* and *infra*, the issue of obviousness is not as clear cut, and there are also factual disputes about the existence and clarity of the various warnings. Moreover, the issue of inconspicuousness of the warnings was never addressed by the *Carbone* court. Thus, *Carbone* is not a sufficient basis for concluding that plaintiff's failure to read the warnings precludes this cause of action, in light of the case law to the contrary cited above.

**21.** Defendants do acknowledge in a later footnote that the "lack of proximate cause" argument cited in *Power* would not apply in situations of "insufficient prominence" or inconspicuousness, but assert incorrectly that the conspicuousness issue is not raised in this case.

**22.** While some language in *Power* suggests that this exception applies only in the workplace context, the District of Columbia Circuit case on which the *Power* court relied for this theory, *Ferebee v. Chevron Chemical Co.,* 736 F.2d 1529 (D.C.Cir.), *cert. denied,* 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984), did not so limit its analysis. Rather, the *Ferebee* court said that "if the jury could reasonably have found that the information on an adequately labelled [product] would have been communicated to [the plaintiff]—even if he personally did not read the warning—the failure to provide such a warning could validly be treated as a proximate cause of [the plaintiff's injury]." *Id.* at 1538. Because there was substantial evidence in that case that communication between coworkers would have led to oral retransmission of an adequate warning to the plaintiff, or that an adequate warning would have led plaintiff's employers to undertake steps that would have protected him from injury, the plaintiff's failure to read the label himself was not considered fatal to the chain of causation. *Id.* at 1539. It was the "realities of society," and of the lines of communication, that controlled the court's conclusion about causation, not any belief that such realities were limited to the workplace. *Id.*

(Anderson, Sr. Dep. at 27–28) and with the warning that users should not do somersaults. (Anderson, Sr. Dep. at 20–21). He also said that he specifically cautioned his daughter against doing somersaults because "that was one of the things in the cautions that [it] said not to do." (*Id.* at 22) A jury could reasonably conclude that had he also seen clear warnings in the manual, or on the trampoline, that his son should not jump off-center, or that a safety cage had been designed and was available precisely to reduce the otherwise significant danger of serious injury from falling off the trampoline, he would have cautioned his son or even delayed use of the trampoline until he purchased such a cage.[23] This is particularly true in light of testimony by both plaintiff and his father, in their depositions, that the father had already delayed purchase of the trampoline because of his concerns about its possible danger, and in light of the fact that the father attests to passing along very strong warnings about trampoline limitations to his other children. (*Id.* at 28–29.) A jury could reasonably conclude, as well, that a father would be at least as likely as a supervisor or coworker to pass on such warnings. Moreover, two other adults were in attendance while plaintiff bounced on the trampoline, and a jury might conclude that conspicuously-posted labels, clearly warning about potential spinal cord injury or the benefits of a safety cage or the need to stay in the center, might have been passed along as well.[24] While the court has found no other New York cases

that rely on this specific theory,[25] it is certainly consistent with the cases that refuse to exclude "failure to warn" causes of action as a matter of law simply on the grounds that the plaintiff has not read the warnings, but require instead that the specific facts be analyzed to determine whether the "strong [presumptive] causal linkage" between the failure to warn and the injury has been successfully rebutted. *Liriano II*, 170 F.3d at 272 (citing *Martin v. Herzog*, 228 N.Y. 164, 126 N.E. 814 (1920) (Cardozo, J.)). Applying this line of New York law to the facts of this case, I cannot conclude that defendants have "negat[ed] the existence of a genuine factual issue," *Hoffman–Rattet*, 135 Misc.2d at 751, 516 N.Y.S.2d 856, and therefore I see no basis for dismissing the claim as a matter of law based only on plaintiff's failure to read existing warnings.

### B. The "Obviousness" Argument.

■■■ As noted above under the discussion of assumption of the risk, defendants have not established that the dangers created by trampoline usage, in general or in the areas specifically identified by the plaintiff (e.g., failure to use a safety cage, failure to stay in the center of the trampoline, failure to provide adequate ground cover, seriousness of the potential injury), have been held obvious as a matter of law in New York. The *Liccione* case on which defendants rely did not hold that the dangers of jumping on a trampoline are obvious as a matter of law, despite the fact

23. The jury could also reasonably conclude that if notice about a safety cage had been displayed on the box or in the store, Anderson, Sr. might have purchased one at the time he bought the trampoline.

24. While Katherine Flagg professes to feeling, but not articulating, concerns about plaintiff's off-center jumping, a jury might conclude that seeing specific cautions about that behavior, in writing, would have encouraged her to speak up to plaintiff.

25. In *Power* itself, the trial court, based on this theory, sent the "failure to warn" issue to the jury, which, on the evidence before it at

trial, absolved the manufacturer of any breach of its duty to warn. However, the First Department reversed that verdict and sent the case back for a new trial, concluding that the court had improperly excluded evidence of the manufacturer's knowledge, prior to the accident, of the risk that caused the injury, knowledge which was relevant to the "failure to warn" claim. *Power v. Crown Equipment* Corp., 189 A.D.2d 310, 596 N.Y.S.2d 38 (1st Dep't 1993). The First Department did not address, in its remand decision, the issue of plaintiff's failure to read the warnings.

that the manufacturer in that case argued to the court that it should reach such a conclusion. (*See* Jumpking Brief at 5–8.) Rather, the *Liccione* decision held only that the particular plaintiff in the case "was of sufficient age, education *and experience* to *assume the risks*" of jumping, and that *the particular warnings* provided by Jumpking were adequate to advise users of the risks. *Id.,* 252 A.D.2d at 956, 675 N.Y.S.2d 728 (emphasis added).

Similarly, the *Williams* case discussed only the plaintiff's assumption of the "obvious risk inherent *in the maneuver [a flip] which he had undertaken.*" *Id.,* 38 Misc.2d at 148–49, 238 N.Y.S.2d 63 (emphasis added).[26] Moreover, there is no uniform consensus in other jurisdictions that the risks associated with a trampoline are obvious; some courts in other states have found the question of the obviousness of a trampoline's dangers to be one of fact for the jury. *See, e.g., Bryant v. Adams,* 116 N.C.App. 448, 466, 448 S.E.2d 832 (1994), *review denied,* 339 N.C. 736, 454 S.E.2d 647 (1995); *Liesener v. Weslo, Inc.,* 775 F.Supp. 857, 861 (D.Md.1991); *cf. Pell v. Victor J. Andrew High School,* 123 Ill.App.3d 423, 78 Ill.Dec. 739, 462 N.E.2d 858 (1984) (affirming liability for, *inter alia,* failure to warn of possibility of spinal cord injury, based on fact-specific analysis of the knowledge of potential users); *Garrett v. Nissen Corp.,* 84 N.M. 16, 498 P.2d 1359 (1972) (analyzing need to warn on basis of *actual knowledge* of trampoline user, and finding no need to warn of the particular danger that caused the injury where jumper had extensive trampoline experience, and as a result of experience actually knew the danger of performing

that specific maneuver) (*overruled on other grounds, Klopp v. Wackenhut Corp.,* 113 N.M. 153, 824 P.2d 293 (1992)).

As in *Bryant,* the affidavit of plaintiff's expert in this case, along with supporting documentation from the Consumer Product Safety Commission ("CPSC"), raise a triable issue, *inter alia,* as to whether the need to jump only in the center, and the ease of being thrown off the trampoline and being severely injured, are really obvious to the average jumper with little or no trampoline experience. (*See, e.g.,* Rabinoff Aff. at 8–10, and Ex. 11 at page 57 (CPSC report describing how most people know very little about their "sensorimotor" limitations and how easily they can be thrown off-balance on the trampoline); Rabinoff Aff. at 10–13 (summarizing deposition testimony of defendant manufacturer's trampoline designers and other experts who were unaware of the need to jump only in the center)). A jury could also reasonably find that the need for impact-absorbing ground covering around the trampoline— or an understanding of what kind of ground covering would be sufficient to prevent injury—was less than obvious, especially to *a casual user* who had never jumped on a trampoline before. As the Second Circuit noted in *Liriano II,* the New York Court of Appeals has directed that the question of whether a warning was needed must be asked in terms of the information available *to the injured party,* rather than the information available to the party who owned the equipment that injured him. *Id.* at 269, 677 N.Y.S.2d 764 (citing *Liriano I,* 92 N.Y.2d at 241, 677 N.Y.S.2d 764, 700 N.E.2d 303).[27] As noted

---

**26.** The *Carbone* case is completely inapposite, as it addressed only the obviousness of the risk of shooting someone with a slingshot.

**27.** Defendants themselves spend two pages of their brief arguing that the success of seven or eight jumpers, including children, in jumping on the trampoline immediately before plaintiff's accident, without difficulty and without feeling that they were in danger or were about to fall off, was "relevant" and "persuasive" to demonstrate that the trampoline was

*not* dangerous and did *not* present a substantial likelihood of harm. (*See* Defendants' Mem. at 30–31.) Certainly this factor is relevant to the question of how "obvious" the dangers were to the plaintiff. This Court finds it curious that defendants are comfortable in arguing both that the trampoline was not dangerous in any way, *and* that any danger was or should have been obvious to the plaintiff.

above, the Court of Appeals has also stated that "[b]ecause of the factual nature of the inquiry, whether a danger is open and obvious is most often a jury question." *Liriano I*, 92 N.Y.2d at 241–42, 677 N.Y.S.2d 764, 700 N.E.2d 303. Since "reasonable minds might disagree as to the extent of the plaintiff's knowledge of the hazard," *id.* at 241, 677 N.Y.S.2d 764, 700 N.E.2d 303, I conclude that this question is one for the jury.

Moreover, the Second Circuit, in *Liriano II*, specifically addressed the question of "when a danger is so obvious that a court can determine, as a matter of law, that no additional warning is required."[28] *Id.* at 267, 677 N.Y.S.2d 764. In that case, which involved a failure to warn that a meat grinder should be operated only with a safety guard attached, the Circuit first took note of the New York rulings "that judges should be very wary of taking the issue of liability away from juries, even in situations where the relevant dangers might seem obvious[.]" *Id.* at 268, 677 N.Y.S.2d 764. The court then explained that stating the issue simply as whether the product in question was "sufficiently known to be dangerous so that manufacturers would be justified in believing that further warnings were not needed," *id.* at 269, 677 N.Y.S.2d 764, or as "whether a failure to warn that [the product is] dangerous would be enough to raise a jury issue ... would be to misunderstand the complex function of warnings." *Id.* at 269–70, 677 N.Y.S.2d 764. As the court explained,

> a warning can do more than exhort its audience to be careful. It can also affect what activities the people warned choose to engage in. And where the function of a warning is to assist the reader in making choices, the value of the warning can lie as much in making known the existence of alternatives as in communicating the fact that a particular

choice is dangerous. It follows that the duty to warn is not necessarily obviated merely because a danger is clear.

> To be more concrete, a warning can convey at least two types of messages. One states that a particular place, object, or activity is dangerous. Another explains that people need not risk the danger posed by such a place, object or activity in order to achieve the purpose for which they might have taken that risk.... [T]he duty to post a [warning] of the second variety may persist even when the danger ... is obvious and a [warning] of the first type would not be warranted.

> One who [engages in an arguably risky activity] ... can benefit not only from being told that his activity is dangerous but from being told of a safer way. One can argue about whether the risk involved in [use of the product] is sufficiently obvious that a responsible person would fail to warn of that risk.... But if it is also the case ... that the risk posed by [the product] can feasibly be reduced by attaching a safety guard, we have a different question. Given that attaching guards is feasible, does reasonable care require that [users] be informed that they need not accept the risks of using unguarded [products]? Even if most ordinary users may—as a matter of law—know of the risk of using a guardless meat grinder, it does not follow that a sufficient number of them will—as a matter of law—also know that protective guards are available, that using them is a realistic possibility, and that they may ask that such guards be used. It is precisely these last pieces of information that a reasonable manufacturer may have a duty to convey even if the danger of using a [product] were itself deemed obvious.

*Id.* at 270–71, 677 N.Y.S.2d 764.

This analysis is directly applicable to the case at bar. In this case, one of the

---

**28.** Defendants have argued that *Liriano II* is not applicable because it can be distinguished on a variety of grounds. I have reviewed their arguments, but conclude that *Liriano II* is in fact directly applicable to this case.

plaintiff's primary allegations, in regard to which he has submitted sufficient evidence to raise a triable issue, is that safety cages or guards were available for use with the trampoline; that the defendants knew, at the time this trampoline was manufactured and sold, that the cages were available and that they were designed to reduce the risk of injury from falling off the trampoline; that Hedstrom got into the trampoline business as a result of agreeing to manufacture such a safety cage for another trampoline manufacturer; that Hedstrom planned to manufacture and market its own "unitized" trampoline-and-cage, and to promote it as a safer alternative to trampolines without safety guards; and that defendants nevertheless sold this trampoline with no safety cage, and with no warning that risk-reducing safety cages were already on the market and available for purchase to use with the Hedstrom trampoline. Defendants have not presented evidence sufficient to completely refute, as a matter of law, plaintiff's submissions in this regard. Thus, on the basis of *Liriano II*, I cannot say, as a matter of law, that defendants had no duty to warn about safety cages in the present case.

In addition, some of the other warnings that plaintiff claims were inadequate— such as warnings that it was important to jump only in the center, to jump only with proper ground covering, or to jump only with professional supervision or spotters— could arguably fall into the *Liriano* category of warnings that "told of a safer

way." Therefore, I conclude that these questions should go to the jury, and the motion to dismiss the failure to warn claim on the ground of obviousness is denied.[29]

### C. Adequacy of the Warnings.

■ Finally, defendants assert that their warnings were adequate as a matter of law. They base this assertion on three grounds: first, that the conclusion in the Fourth Department's *Liccione* case, that certain warnings in that case were adequate, is dispositive here; second, that the warnings on this trampoline were adequate because they met industry standards; and third, that the warnings were adequate because "the safety manual and the labels physically on the trampoline contained numerous warnings relating to plaintiff's injuries" and "adequate warnings were in fact provided." (Def.Mem. at 22–23.)

*(1) The Liccione Case:* The warnings provided in the *Liccione* case, and the circumstances leading to injury in that case, differed in significant respects from those before us in this case. First, defendants in *Liccione* argued that certain of the manufacturer's warnings were displayed on a large yellow laminate sign that hung from the trampoline frame (described in the trampoline manufacturer's brief as a "yellow warning placard"). (*See Liccione Appendix*, Brief of Defendant–Appellant Jumpking, Inc. ("Jumpking Brief") at 8). No such hanging placard existed in this case, so the basis for determining whether any warnings were suffi-

---

**29.** Defendants also assert, as another ground for denying that they had a duty to warn, that any alleged inadequacies in the warnings did not make the product "dangerous" (Def.Mem. at 25), and they also argue that the duty to warn of dangers associated with use of a product arises only if the product itself is shown to be "not reasonably safe" (the standard for establishing a design defect). This is a misreading of New York law, although it might represent the state of the law in some other jurisdictions. As noted above, in New York the duty to warn of "dangers" in the use of the product exists even in the absence of a design defect. *Fane v. Zimmer, Inc.*, 927 F.2d at 128 (inadequate warnings alone are

enough to make a product unsafe); 1A P.J.I.3d 563. Under New York law, the manufacturer's duty is "to warn of all potential dangers which it knew, or in the exercise of reasonable care should have known, to exist," *Bravman v. Baxter Healthcare Corp.*, 984 F.2d 71, 73 (2d Cir.1993), and a failure to warn claim is viable if it is based on evidence that the plaintiff sustained a physical injury or was placed in some physical danger as a result of the failure to warn. *Id.* at 73, 74 (affirming dismissal of design defect claim as a matter of law, but remanding "failure to warn" claim for jury trial to decide if plaintiff sustained physical injury as result of excessive noise).

ciently "conspicuous" differs between the two cases. Second, the placard displayed, *inter alia*, two warnings that are particularly pertinent and that differed from those in the present case. The first said, "USING THIS TRAMPOLINE EXPOSES YOU TO THE RISK OF SERIOUS INJURY, *INCLUDING PERMANENT PARALYSIS OR EVEN DEATH FROM LANDING ON THE BACK, NECK OR HEAD*. THIS RISK EXISTS EVEN IF YOU LAND ON THE TRAMPOLINE MAT (BED)." (Capitals in original, underline added). The second said, "Read and understand the User's Manual and all materials furnished with this trampoline before using." (*See* Plaintiff's Mem. at 3; Jumpking Brief Exhibits at 305.)

First, it is immediately apparent that the warning about injury *on the placard* was much more specific than were those on Hedstrom's labels about the nature and seriousness of the particular kind of injury that the plaintiff in this case actually suffered, and that he asserts should have been included in Hedstrom's warnings. This is particularly important since the manufacturer's brief in *Liccione* focused on the adequacy of warnings "attached to the trampoline," rather than on those in the accompanying manual. *See, e.g.,* Jumpking Brief at 2 ("Question Presented: Whether a genuine, material issue of fact exists ... when the uncontroverted evidence in the record establishes, inter alia, that the plaintiff failed to request and read warnings and instructions *attached to the trampoline* prior to her accident" (underline in original)). In addition, to the extent that warnings in the manual are to be considered, the placard in *Liccione* specifically warns the user that *there is* a User's Manual, and that it should be read and understood before using the trampoline; and the warning about paralysis and neck injury is repeated in full on the cover and in the interior of the "User's Manual." (*See* Jumpking Brief, *id.* at 307 et seq.) By contrast, the Hedstrom warning labels on the trampoline in this case do not specifically mention the existence of any

"Owner's Manual"; and though some of the labels do instruct the user to "read instructions before using this trampoline," the label that is sewn into the frame pad is entitled "Trampoline Instructions," and thus could reasonably be identified by a user as the "instructions" he or she is directed to read.

Moreover, the *additional* warning labels in *Liccione*, displayed on page 306 of the Jumpking Brief, repeat the very specific warning of paralysis and death; and those labels add:

> Do NOT use this trampoline without the direct supervision of a qualified instructor. We recommend United States Gymnastics Federation certified instructors.

(*Id.* (capitalization in original)). This warning was entirely absent from the labels on the Hedstrom trampoline, and that absence is identified by plaintiff as a basis of his failure to warn claim. Defendants claim that professional supervision or instruction (and hence a warning about same) is not necessary unless somersaults or other "inverted" stunts are being performed, but plaintiff disputes that assertion, and raises a triable issue on the subject. In any case, the presence of the warning in *Liccione*, compared to its absence on the Hedstrom trampoline, serves to further distinguish that case from this.

Another significant difference between the two cases is the *Liccione* plaintiff's assertion that she was double-jumping at the time of the accident (a stunt which was specifically warned against in the instructions, and which is not alleged to have occurred in this case). Because of that assertion, one of the central issues in this case—the need to warn about staying in the center—was not equally applicable in *Liccione*, since staying in the center would not be possible while double-jumping. (*See* Jumpking Reply Brief at 6.) Finally, the issue of the availability of a safety cage, a central issue in this case, was raised in *Liccione* only in an affidavit by

plaintiff's expert that the court found to be "plainly conclusory," and therefore inadequate to establish a triable issue for the plaintiff. *Liccione* at 957, 675 N.Y.S.2d 728; (Reply Affirmation of Roger W. Avery, Esq. ("Avery Reply Aff."), in *Liccione* Record at 443, ¶ 5). In addition, it was apparently raised only in regard to allegations of a product defect, rather than in regard to the issue of inadequate warnings, and also apparently failed to identify either the kinds of safety devices referred to or the way in which they might have reduced the risk of injury. (Avery Reply Aff., *id.*) None of those statements apply to this case, in which the issue is raised coherently and with substantial supporting documentation.

In sum, the "failure to warn" claim in *Liccione* reveals such significant factual differences from the claim in the case before me that the conclusions of the *Liccione* court regarding the adequacy of the Jumpking warnings are simply not applicable here.

**(2) *Whether the Warnings Met Industry Standards.*** Defendants assert that their warnings should be found adequate as a matter of law because they met the ASTM industry "warning" standards. That assertion is deficient in at least two respects.

First, even if one were to assume that the warnings provided with this trampoline met all the standards set by ASTM—an assumption that is itself open to dispute based upon the parties' submissions— plaintiff has raised a significant issue of fact as to which of two rather different standards, those of ANSI or ASTM, should actually be recognized as the "industry standard." His submissions on this point, for example, include at least one document from Hedstrom's files indicating knowledge by Hedstrom that the CPSC recommended following the *ANSI* standards for warning and labeling. (*See* August 20, 1997, memorandum to Michelle Klingensmith, in plaintiff's "Bates Num-

bered Documents" submission, Doc. # 0416). Plaintiff has also submitted a CPSC report to the ASTM subcommittee, identifying deficiencies in ASTM standards and recommending the use of ANSI warning standards. (*See* Rabinoff Aff., Ex. 14, *passim* and at ¶ 8.)

Second, even if a jury were to determine that the ASTM standard was the appropriate "industry standard," and that defendants had met it, such a conclusion would not be dispositive as a matter of law in determining whether the warnings were adequate. As the New York Court of Appeals said in *Sawyer v. Dreis & Krump Manufacturing Co.*, 67 N.Y.2d 328, 502 N.Y.S.2d 696, 493 N.E.2d 920 (1986), in determining the relevance of compliance with industry standards to the question of a manufacturer's negligence,

> The ANSI requirements were properly admitted and could be considered by the jury as some evidence of negligence if it first found that the standards set forth in the booklet represented the general custom or usage in the industry. But even if the jury so found, the standards were not conclusive. on the subject of negligence and the jury should have been instructed that they were not conclusive but were to be considered with all the other facts and circumstances of the case in determining whether … defendant's conduct was reasonable.

*Id.* at 337, 502 N.Y.S.2d 696, 493 N.E.2d 920.[30] Thus, I conclude that the question of whether the ANSI or ASTM requirements constitute the industry standard should be left to the jury. The same is true with regard to the question of whether the defendant's compliance, or lack of compliance, with the appropriate standard, when "considered with all the other facts and circumstances of the case," should result in liability for a failure to warn.

**(3) *General Adequacy of the Warnings.*** In light of the clear direction under

---

**30.** I reiterate the holdings of the New York courts that liability for a failure to warn in New York relies upon the same standards in both negligence and strict liability claims.

New York law that "[f]ailure to warn liability is intensely fact-specific," *Liriano I*, 92 N.Y.2d at 243, 677 N.Y.S.2d 764, 700 N.E.2d 303, and that "[t]he generally accepted rule ... is that the reasonableness vel non of a set of warnings is a question of fact for the jury," *Cooley*, 102 A.D.2d at 647, 478 N.Y.S.2d 375, I conclude that there is no basis for removing from the jury the question of the adequacy of the warnings. Whether those warnings should have specified, for example, the specific danger of paralysis from neck injury, rather than only the danger of "serious injuries," is a question upon which reasonable people could disagree, particularly in light of the variations between ASTM and ANSI standards. *See also Pell*, 123 Ill. App.3d 423, 78 Ill.Dec. 739, 462 N.E.2d 858 (1984) (jury could conclude that warnings were ineffective where they did not specify risk of severe spinal cord injury). Similarly, in light of defendants' own contention that plaintiff's injuries were caused by his failure to bounce in the center of the trampoline (*see, e.g.*, Dep. Reply Mem. at 1), a jury could reasonably decide that the absence, on the trampoline labels, of any warning to bounce only in the center, constituted a failure to adequately warn, even though a statement in the Owner's Manual did advise, "Avoid bouncing too high. Stay low until you can control your bounce and repeatedly land in the center of the trampoline." (Lewittes Aff. at 6, Welsh Aff. at Ex. B (0018)).[31]

There are, as well, genuine factual issues as to the need for professional instruction and the adequacy of warnings in that regard, as well as the adequacy and "conspicuousness" of any warnings about the need for spotters. The Owner's Manual warned that "**Spotters are essential** for all beginners and for development of advanced skills" (Lewittes Aff. at 5 (bold in original)), but the only label on the trampoline that arguably addressed either "spotters" or "professional instruction" was the one sewn into the frame pad that said, "Use trampoline only with mature, knowledgeable supervision." (Welsh Aff., Ex. C). A conclusion about the adequacy of "ground covering" warnings also depends on a variety of disputed fact issues, ranging from whether ground coverings and warnings about them were necessary at all (according, for example, to ASTM standards), or whether the warnings given were complete enough to be meaningful to a non-expert purchaser, to whether notice to a non-expert *owner* in the Owner's Manual would be sufficiently conspicuous to warn a *user* of the danger of jumping in the absence of adequate ground covering.[32]

**31.** Closely related to the claim of a duty to warn users to *bounce* in the center is the claim that users should have been warned to *mark* the center of the trampoline to make center bouncing easier. This claim is based in part on a safety manual, which Hedstrom allegedly approved for distribution (along with a video) before the date of the accident, in which the author suggested that such marking was "a good idea." (*See* Am.Compl. ¶ 9(n); Lewittes Aff., Ex. 11 at 01219.) Hedstrom does not deny that the video and safety manual were approved or available at the time plaintiff's father purchased the trampoline, and the parties appear to agree that it was not offered to him.

**32.** The case of *Reale v. Herco, Inc.*, 231 A.D.2d 619, 647 N.Y.S.2d 533 (2d Dep't 1996), cited by defendants in regard to their duty to warn about ground cover, is distinguishable on a number of grounds. In that case, the court found a manufacturer not to be "at fault" because its installation instructions specified the use of resilient materials around a playground slide. That finding, however, is addressed to the situation in which a professional *commercial* playground operator was alleged to have been negligent in failing to put resilient material around a slide that was used by a three-year-old child. The plaintiff's actual theory of liability against the manufacturer, who was a later-added defendant in that case, is not clearly identified; the claim, if it was actually based on a failure to warn, may well have been limited to that of a failure to adequately warn the playground operator, in the installation instructions, of the need for resilient ground covering. Significantly for this case, the decision does not specify the kind of warning that was given by the manufacturer and found adequate; it may have been more complete than that offered by Hedstrom. Even if we knew what words

The plaintiff also raises the issue of whether certain warnings should have been included on the *carton* in which the trampoline was sold, and that argument could logically apply to ground-covering warnings. If such protective covering is important to safety, as defendants argue, and if it costs as much as, or more than, the trampoline (a factual claim supported by a mulch supplier's affidavit, and one which the jury should have the opportunity to evaluate), then a jury might reasonably conclude that that information should be revealed to the consumer on the carton, before he or she buys the trampoline, to increase the likelihood that only those who are willing to undertake the necessary expense will actually purchase trampolines.[33]

Finally, I cannot conclude, in light of *Liriano II*, that defendants, as a matter of law, had no obligation to warn of the existence of a safety cage that might have reduced the possibility of injuries such as those suffered by plaintiff. Defendants argue that "plaintiff offers no evidence that a trampoline with an enclosure would prevent injuries such as plaintiff's without causing other kinds of injuries." (Def. Reply Mem. at 8). However, plaintiff has submitted substantial documentation from the files of the manufacturer that could reasonably support an inference that Hedstrom, at the time it put this trampoline on the market, knew about and planned to manufacture a safety cage—a device that it now apparently makes available to its customers (*see* Keegan Aff. at 12, and Ex. 25 thereto (picture of carton stating "Enclosed trampoline for safety and fun! Enclosure offers protection from falling off"))—and that Hedstrom knew or believed that such a cage would be likely to reduce injury from falling off the trampoline.[34]

---

were used, the factual posture of that case—concerning a professional playground operator catering to children too small to read—is significantly different from that of our case, in which we are dealing with a non-expert homeowner and a grown plaintiff using a product designed for use by people over age six. While the court did not articulate the reasoning behind its conclusion that the manufacturer was not "at fault"—making it more difficult to judge whether its decision is consistent with decisions by New York's highest court—it is quite possible that it was based on a theory similar to New York's "informed intermediary" doctrine, *see, e.g., Martin v. Hacker,* 83 N.Y.2d 1, 9, 607 N.Y.S.2d 598, 628 N.E.2d 1308 (1993) (applying doctrine to doctors), that allows warnings to be given to a party with a professional duty to provide for the safety of intended users, rather than directly to the ultimate user himself. This conclusion is made more likely by the fact that there are CPSC guidelines about ground covering that are specifically geared to playgrounds (*see* Rabinoff Aff., Ex. 16), of which the average consumer would be unaware, and that the plaintiff in *Reale* specifically proffered expert testimony that the landowner's installation "departed from the pertinent Consumer Product Safety Commission standards for enhancing playground safety." *Milici v. Maresca,* 178 Misc.2d 249, 251, 678 N.Y.S.2d 864 (N.Y.Sup.Ct.1998); *cf. Scarangella v. Thomas Built Buses, Inc.,* 93 N.Y.2d 655, 695 N.Y.S.2d 520, 717 N.E.2d 679 (1999) (manufacturer's liability for absence of optional safety feature varies based on knowledgeability of buyer and buyer's ability to balance benefits and risks). In any event, it is clear under New York law that the question of whether a warning was needed must be asked in terms of the information available to the injured party, rather than the information available to the party who owned the equipment that injured him. *See Liriano I,* 92 N.Y.2d at 241, 677 N.Y.S.2d 764, 700 N.E.2d 303. Therefore, a warning that was found adequate for a professional playground operator, even if it were identical to one provided by Hedstrom, would not necessarily be adequate as a matter of law to warn a non-expert adult consumer *user* of the danger of jumping without resilient ground cover.

**33.** A similar argument could logically apply to the safety cage as well, but the fact that Hedstrom provided no warning at all about that safety device makes any argument about conspicuousness moot.

**34.** Defendants have also suggested two other grounds for dismissal of the failure to warn claim, based on the absence of a duty to warn. The first is that the plaintiff actually knew that it was dangerous to jump off-center, and that therefore it was unnecessary to warn him about that danger. However, I cannot conclude on the basis of this record, as a matter of law, that the defendant knew

For example, Hedstrom's own quality assurance manager, Francis Pavolko, in discussing the advantages of a planned "unitized" trampoline with safety cage, explained, "we're firm believers that ... the majority of injuries associated with trampolines are from people falling off of them. If you can prevent that from happening, you can eliminate many of those injuries." (Pavolko Dep. at 79–81.) In addition, plaintiff submits an advertisement assertedly prepared but not used by Hedstrom, offering its 13–foot trampoline in combination with a safety cage, that reads, "The Jump Court safety enclosure makes your trampoline a lot safer. Dramatically reduces accidents because it keeps jumpers safely enclosed." (Keegan Aff. at 11 and Ex. 24.) In light of these evidentiary submissions, which I note are not specifically challenged by defendants on this motion, plaintiff has raised a triable issue for the jury as to defendants' obligation to warn of the existence of a safety cage.

For these reasons, defendants' motion for summary judgment dismissing the "failure to warn" claims is denied.

### III. The Design Defect Claim.

Plaintiff claims that the circular trampoline sold by Hedstrom is inherently too dangerous for general backyard use, and that it was defective because it was sold without a safety cage (either as an option or an included feature) and because there were no center markings to assist the jumper to stay in the center. Defendants argue that as a matter of New York law, "a circular designed trampoline is reasonably safe." (Def.Mem. at 29.) They base this assertion on a variety of factors, ranging from a reliance on statements in *Lic-*

*cione v. Gearing,* 252 A.D.2d 956, 675 N.Y.S.2d 728 (4th Dep't 1998), *appeal denied,* 92 N.Y.2d 818, 685 N.Y.S.2d 420, 708 N.E.2d 177 (1999), *supra,* to factors such as the alleged compliance of the trampoline with industry safety standards, the plaintiff's purported failure to exercise reasonable care, and the asserted insufficiency of evidence in plaintiff's submissions to demonstrate that the product was not reasonably safe.

In support of their arguments, defendants cite both to cases addressing the standards applicable to negligence, and to other cases addressing the standards applicable to strict liability, without distinguishing between the differing theories of liability or the different standards applicable to each theory. While there is no doubt that there are substantial similarities between the two theories of product liability for defective design, *see Lancaster Silo & Block v. Northern Propane Gas,* 75 A.D.2d 55, 427 N.Y.S.2d 1009 (4th Dep't 1980); *DeRosa v. Remington Arms Co., Inc.,* 509 F.Supp. 762, 766–67 (E.D.N.Y. 1981), the theories are not identical; as noted below, for example, the negligence standard relies, *inter alia,* upon evidence about the reasonableness of defendants' behavior, including evidence about what each defendant actually knew or should have known, which is not relevant in strict liability cases. However, it is clear from the introductory portions of defendants' brief that, at least with regard to the design defect claim, defendants are substantively disputing only the strict liability portion of the claim (*see* Def.Mem. at 4–6), and that they base their request for dismissal of the negligence and breach of

that jumping off-center was dangerous. There is a sufficient basis for a jury reasonably to conclude that he was not aware of the danger; thus, the claim must go to the jury. Second, defendants appear to argue that plaintiff, through certain actions like jumping off-center or jumping without spotters, "misused" the trampoline, and therefore relieved them of their duty to warn. However, it is clearly established under New York law that

"a manufacturer may be liable for failing to warn against the dangers of foreseeable misuse of its product," *Liriano I,* 92 N.Y.2d at 240, 677 N.Y.S.2d 764, 700 N.E.2d 303. Even if such actions by the plaintiff were to be characterized, for the sake of argument, as "misuse," there is certainly a reasonable basis for a jury to find that such "misuse" was foreseeable, and that warnings were therefore required.

implied warranty portions of the claim solely on the ground that "[b]ecause plaintiff's claims based on theories of strict liability are subject to dismissal on summary judgment, plaintiff's remaining claims, sounding in negligence and breach [of] implied warranties, fail, as well." (Def.Mem. at 6.) In addition, defendants present no coherent argument or evidence relating to the issue of defendants' duty of care, or any breach of that duty, under a negligence standard. Thus, I will analyze this issue on the basis of New York law relating to strict liability for design defects.[35]

■ The fundamental principles of strict products liability were laid out by the New York Court of Appeals in *Voss v. Black & Decker Manuf. Co.*, 59 N.Y.2d 102, 463 N.Y.S.2d 398, 450 N.E.2d 204 (1983). As I discussed above (*see* pp. 439–40, *supra*) under the law of strict products liability a plaintiff may assert that a product is defective because there was a mistake in the manufacturing process, a failure to provide adequate warnings, or an improper or "defective" design. *Id.* at 106–07, 463 N.Y.S.2d 398, 450 N.E.2d 204. In this case, plaintiff is alleging not only that the warnings were inadequate, as discussed *supra*, but also that the product is defectively designed. He claims that the kind of circular trampoline at issue in this case is inherently dangerous and unsuitable for use by the general public, that it was defective because it contained no center marking to assist the jumper in staying in the safe center zone, and that it was defective because a safer alternative, in the form of a safety cage or "unitized" trampoline-and-cage design, was available but was not offered for purchase (either as part of the trampoline or as an option) by the defendants.

■ Under New York law,

a defectively designed product is one which, at the time it leaves the seller's hands, is in a condition not reasonably contemplated by the ultimate consumer and is unreasonably dangerous for its intended use: that is[,] one whose utility does not outweigh the danger inherent in its introduction into the stream of commerce. Strict products liability for design defect thus differs from a cause of action for a negligently designed product in that the plaintiff is not required to prove that the manufacturer acted unreasonably in designing the product. The focus shifts from the conduct of the manufacturer to whether the product, as designed, was not reasonably safe. A manufacturer is held liable regardless of his [or her] lack of actual knowledge of the condition of the product because he [or she] is in the superior position to discover any design defects and alter the design before making the product available to the public. Liability attaches when the product, as designed, presents an unreasonable risk of harm to the user.

*Id.*, 59 N.Y.2d at 107, 463 N.Y.S.2d 398, 450 N.E.2d 204 (citations omitted). The court further clarified that the manufacturer's knowledge, "actual or constructive," is not in issue; "rather, the design of the product in light of the state of the art at the time of production is the issue." *Id.* at 111, 463 N.Y.S.2d 398, 450 N.E.2d 204. As the Court of Appeals explained in *Cover v. Cohen,* 61 N.Y.2d 261, 473 N.Y.S.2d 378, 461 N.E.2d 864 (1984), the question is "whether *a reasonable person with knowledge of the potential for injury of the product and of the available alternatives,* balancing the product's risks against its utility and costs and against the risks, utility and cost of the alternatives, would have concluded that it should not have been marketed in the condition that it

---

**35.** The defendants' briefs also provide no specific argument relating to the breach of warranty claim, other than some brief references, unsupported by the evidence, to a purported absence of causation. Thus, I consider that portion of the defendants' motion to have been effectively abandoned.

was." *Id.* at 266–67, 473 N.Y.S.2d 378, 461 N.E.2d 864 (emphasis added).

■ In order to establish a prima facie case of a design defect, the plaintiff must show two things: first, that "the manufacturer breached its duty to market safe products when it marketed a product designed so that it was not reasonably safe," and second, that "the detective design was a substantial factor in causing plaintiff's injury." *Voss,* 59 N.Y.2d at 107, 463 N.Y.S.2d 398, 450 N.E.2d 204.

■ A product that is "not reasonably safe" is a product in regard to "which, if the design defect were known at the time of manufacture, a reasonable person would conclude that the utility of the product did not outweigh the risk inherent in marketing a product designed in that manner." *Id.* at 108, 463 N.Y.S.2d 398, 450 N.E.2d 204 (citing 1 N.Y.PJI2d 138–39 (1982 Supp.)).

> *It will be for the jury to decide whether a product was not reasonably safe in light of all the evidence presented by both the plaintiff and defendant.* The plaintiff … is under an obligation to present evidence that the product, as designed, was not reasonably safe because there was a substantial likelihood of harm and it was feasible to design the product in a safer manner. The defendant manufacturer, on the other hand, may present evidence in opposition seeking to show that the product is a safe product—that is, one whose utility outweighs its risks when the product has been designed so that the risks are reduced to the greatest extent possible while retaining the product's inherent usefulness at an acceptable cost. *The question for the jury,* then, is whether after weighing the evidence and balancing the product's risks against its utility and cost, it can be concluded that the product as designed is not reasonably safe.

*Voss, id.* at 108–09, 463 N.Y.S.2d 398, 450 N.E.2d 204 (citations omitted, emphasis added). The manufacturer's obligation extends to making the product reasonably safe for both its intended and "unintended yet reasonably foreseeable use." *Sheppard v. Charles A. Smith Well Drilling and Water Systems,* 93 A.D.2d 474, 478, 463 N.Y.S.2d 546 (3d Dep't 1983) (quoting *Micallef v. Miehle Co., Div. of Miehle–Goss Dexter,* 39 N.Y.2d 376, 385–86, 384 N.Y.S.2d 115, 348 N.E.2d 571 (1976)).

The Court of Appeals identified a series of factors that a jury may consider in balancing "the risks inherent in the product, as designed, against its utility and cost." *Id.* at 109, 463 N.Y.S.2d 398, 450 N.E.2d 204. The pertinent factors may include:

> (1) the utility of the product to the public as a whole and to the individual user; (2) the nature of the product—that is, the likelihood that it will cause injury; (3) the *availability* of a safer design; (4) the *potential* for designing and manufacturing the product so that it is safer but remains functional and reasonably priced; (5) the ability of the plaintiff to have avoided injury by careful use of the product; (6) the degree of awareness of the potential danger of the product which reasonably can be attributed to the plaintiff; and (7) the manufacturer's ability to spread any cost related to improving the safety of the design.

*Voss, id.* (emphasis added).

Unlike certain states which do not allow plaintiffs behavior to be raised as an affirmative defense in a strict liability action, New York does allow certain of the traditional contributory or comparative negligence factors to be considered by a jury. In *Codling v. Paglia,* 32 N.Y.2d 330, 345 N.Y.S.2d 461, 298 N.E.2d 622 (1973), the Court of Appeals found that a finding of "contributory fault" (the plaintiff-negligence standard that was operational in New York in 1973) constituted a defense in a strict products liability action, *id.* at 343, 345 N.Y.S.2d 461, 298 N.E.2d 622, and could be based on any of three factors: "use of the product for other than its

normally intended purpose or other than in the manner normally intended[;] . . . the failure to exercise such reasonable care as would have disclosed the defect and the danger attributable thereto[; or] the question whether [the plaintiff] independently exercised that degree of care for his own safety that a reasonably prudent person would have exercised under the same circumstances." *Id.* at 343–44, 345 N.Y.S.2d 461, 298 N.E.2d 622.

At the time of the *Codling* decision, the common law rule of contributory negligence was still in effect in ˙New York; therefore, a finding of contributory negligence resulted in a complete defense to a plaintiff's action, and plaintiff had the burden of pleading and proving his or her freedom from contributory negligence. *See, e.g.,* N.Y.C.P.L.R. § 1412 (Practice Commentaries) (McKinney's 1997); 1A N.Y.PJI3d 542.[36] In 1975 New York passed its comparative fault statutes, N.Y.C.P.L.R. §§ 1411 & 1412 (McKinney's 1997), which converted the plaintiff's culpability from a complete defense to a partial one resulting in apportionment of damages, and shifted to the defendant the burdens of pleading and proof for what was now an affirmative defense. *See* N.Y.C.P.L.R., *id.* (and Practice Commentaries thereto). Thus, the burden is now on the defendants to prove the three *Codling* elements as an affirmative defense, and if the defendants do so, plaintiff's recovery will be reduced but not precluded. *Voss,* 59 N.Y.2d at 102, 463 N.Y.S.2d 398, 450 N.E.2d 204 n. * ("defendant will have the opportunity to offer proof on various defense matters such as . . . plaintiff's misuse which might raise questions of comparative fault"); *Sheppard,* 93 A.D.2d at 477–78; , 463 N.Y.S.2d 546 1A N.Y.PJI3d 542.

In light of the pertinent New York law and its applicability to the facts of this

case, I cannot conclude that a trampoline of circular design is reasonably safe as a matter of law under the law of New York. The courts have made it clear that as a rule this question is one for the jury, and involves an extensive multi-factor balancing test. That test involves evaluation and weighing of large amounts of factual information, as well as the credibility of different witnesses and the weight to be given to various evidentiary submissions which raise genuine issues about conflicting viewpoints. It also involves questions of judgment and reasonableness, such as the utility of a trampoline to society, the question of how many injuries are "reasonable," and the reasonableness of various pricing structures for potential safety features, that are particularly within the province of the jury.

I do not agree with defendants' claim that the question of a trampoline's safety has already been answered as a matter of law in the *Liccione* case. The court concluded that the manufacturer "established its entitlement to judgment as a matter of law with respect to the allegations of defective manufacture, design and construction" of the trampoline at issue in that case, *Liccione,* 252 A.D.2d at 957, 675 N.Y.S.2d 728 but the court's conclusion was based not on the presence of irrefutable proof that a circular trampoline is unquestionably safe, but rather on the absence of a satisfactory evidentiary submission by the plaintiff. Specifically, the court stated that "By submitting an affidavit of an expert that was plainly conclusory, plaintiff failed to raise a triable issue of fact in opposition to Jumpking's motion." *Id.*

That conclusion is not a binding statement of law as to the safety of a trampoline, and it is not applicable to this case, in

---

**36.** Although the *Codling* court specifically considered applying the principles of *comparative* negligence to the action before it—which would have resulted in *apportionment* of responsibility between the plaintiff and defendant—it ultimately concluded that it was not

prepared at that time to substitute comparative negligence principles for the existing ones, because that topic was "more appropriate for legislative address." *Id.* at 344–45, 345 N.Y.S.2d 461, 298 N.E.2d 622.

which the plaintiff's submissions on the issues involved in a determination of safety are substantial. Plaintiff here has presented evidence of the extent of danger and injury from trampoline use that is sufficient to allow a jury to evaluate those dangers, and the defendants' submissions disputing that evidence simply raise a genuine issue of fact for the jury. In addition, plaintiff has provided adequate evidence relating to the availability of safety cages at the time of manufacture and sale of the trampoline, and to the potential for (and cost of) designing the product in a "unitized" way that would necessarily include the safety cage as part of the trampoline. He also presents sufficient evidence to allow a jury reasonably to consider the added value of providing a center marking. As to the defendants' argument that center markings are not necessary, the plaintiff has presented evidence sufficient to raise a triable issue as to the validity of that assertion, including recommendations for the use of center markings by the CPSC in the United States and requirements for such markings in the New Zealand and British trampoline standards. (See Rabinoff Aff., Ex. 14 at ¶ 5.) As to defendants' argument that the placement of center markings on a trampoline is simply not technically feasible, the parties' opposing submissions have not conclusively answered that question, particularly in light of the "High Performance" videotape assertedly made available by Hedstrom and submitted by plaintiff in opposition to this motion (see Rabinoff Aff. at Ex. 15, and tape labeled as Plaintiff's Ex. 10), which clearly shows various kinds of center markings on the rectangular trampolines being used by the jumpers. In short, plaintiff has submitted evidence sufficient to raise a triable issue on the factors that must be considered in evaluating a product-defect claim.

Defendants' other asserted grounds for dismissal of the claim are also flawed. As was the case in regard to the issue of meeting "industry standards" for adequate warnings (discussed supra), the question of whether the trampoline met industry standards for safety is both genuinely disputed and non-dispositive on the issue of defectiveness, and therefore does not form an adequate basis for granting summary judgment. As the law makes clear, questions about misuse or negligence on the part of the user constitute only potential defenses, which are not to be considered until after a determination about whether the product was "not reasonably safe" has been made.[37]

Defendants are correct that a comparison of the existing design against possible alternatives must take into account whether the proposed alternatives would be likely to have prevented some of plaintiff's injuries without causing others, Burgos v. Lutz, 128 A.D.2d 496, 497–98, 512 N.Y.S.2d 424 (2d Dep't 1987); DeRosa v. Remington Arms Co., Inc., 509 F.Supp. 762, 768 (E.D.N.Y.1981) (Weinstein, C.J.)—that is, whether the alternative designs would actually be "safer." However, there is no question that plaintiff has offered sufficient evidence to reach the jury on the question of whether the proposed changes would have reduced, or even prevented, the kind of injury that plaintiff and others suffered—that is, injury from being propelled off the trampoline. On the other hand, defendants have offered no conclusive evidence that the likelihood of other injuries would be increased by the use of a center marking, and no evidence at all that the likelihood of injury would be increased by use of a safety cage such as those which are already on the market, and which the plaintiff's submissions indicate Hedstrom itself is now selling. Thus, the plaintiff is

---

**37.** While there may exist certain misuses of a product that are so outrageous that they fail to satisfy the requirement that a product was being used for its intended or reasonably foreseeable use, plaintiff's act of jumping off-center does not fall into this category. Even if such behavior were arguably a "misuse" that was unintended by the manufacturer, it was certainly foreseeable.

entitled to go to the jury on the issue of whether his suggested alternatives were safer, as well as whether they were available or feasible.

Finally, defendants also argue that the availability or potential of an alternative design, such as a center marking or safety enclosure, is "simply . . . irrelevant" if the plaintiff does not *first* prove that the trampoline presented an unreasonable risk of harm. (Def.Mem. at 33.) That argument, however, is belied by the case law. The Court of Appeals specifically identifies "the availability of a safer design" and "the potential for designing and manufacturing the product so that it is safer but remains functional and reasonably priced," *Voss,* 59 N.Y.2d at 109, 463 N.Y.S.2d 398, 450 N.E.2d 204 (citing *Rainbow v. Albert Elia Bldg. Co., Inc.,* 79 A.D.2d 287, 291, 436 N.Y.S.2d 480 (4th Dep't 1981), *aff'd,* 56 N.Y.2d 550, 449 N.Y.S.2d 967, 434 N.E.2d 1345 (1982)), as two of the primary elements of the balancing test that a jury should undertake *to determine* whether the product presents an unreasonable risk of harm. *See also Voss* at 108, 463 N.Y.S.2d 398, 450 N.E.2d 204 (in addressing before the jury the question of whether a product is not reasonably safe, "[t]he plaintiff, of course, is under an *obligation* to present evidence that the product, as designed, was not reasonably safe because there was a substantial likelihood of harm *and it was feasible to design the product in a safer manner"* (emphasis added)).

More recently, in *Scarangella v. Thomas Built Buses, Inc.,* 93 N.Y.2d 655, 695 N.Y.S.2d 520, 717 N.E.2d 679 (1999), the Court of Appeals addressed a plaintiff's claim that the absence, on the product at issue, of an available but optional safety feature, was a design defect. The court reaffirmed the non-exclusive factors identified in *Voss,* and specifically highlighted, as a factor to be balanced in the prima facie case, "the usefulness of the product to the consumer as designed *as compared to a safer design* and the functional and monetary cost *of using the al-*

*ternative design." Scarangella,* id. at 659, 695 N.Y.S.2d 520, 717 N.E.2d 679 (emphasis added). Furthermore, the Court then analyzed two cases in which the defendant manufacturers *had* made a safety device available (but only as an option), *Biss v. Tenneco, Inc.,* 64 A.D.2d 204, 409 N.Y.S.2d 874 (4th Dep't 1978), *appeal denied,* 46 N.Y.2d 711, 416 N.Y.S.2d 1025, 389 N.E.2d 841 (1979); and *Rainbow, supra,* 79 A.D.2d 287, 436 N.Y.S.2d 480, as well as another case in which the manufacturer *did not* make a safety device available (*Rosado v. Proctor & Schwartz, Inc.,* 66 N.Y.2d 21, 494 N.Y.S.2d 851, 484 N.E.2d 1354 (1985)), to "distill some governing principles for cases where a plaintiff claims that a product without an optional safety feature is defectively designed because the equipment was not standard." *Id.* It concluded that only where the evidence demonstrates the presence of three specific factors—which show that "the buyer, not the manufacturer, is in the superior position to make the risk-utility assessment,"—will a "well-considered decision" by a buyer to "dispense with" optional safety equipment excuse the manufacturer from liability, and allow the court to prevent the lack-of-safety-feature claim from going to the jury. To bar the claim, the evidence and reasonable inferences therefrom must show that

(1) the buyer is thoroughly knowledgeable regarding the product and its use and is actually aware that the safety feature is available; (2) there exist normal circumstances of use in which the product is not unreasonably dangerous without the optional equipment; *and* (3) the buyer is in a position, given the range of uses of the product, to balance the benefits and the risks of not having the safety device in the specifically contemplated circumstances of the buyer's use of the product. . . . When the factors are not present, there is no justification for departure from the accepted rationale imposing strict liability upon the manufacturer because it "is in the supe-

rior position to discover any design defect."

*Scarangella,* 93 N.Y.2d at 661, 695 N.Y.S.2d 520, 717 N.E.2d 679 (quoting *Voss,* 59 N.Y.2d at 107, 463 N.Y.S.2d 398, 450 N.E.2d 204).

 In this case, the factors are not present. With regard to factor (1), neither the buyer nor the user was thoroughly knowledgeable regarding trampolines, and neither was actually made aware that a safety cage was available, although plaintiff presents evidence that several such options did exist in the market. In regard to factor (2), the defendants admit that the trampoline is not the kind of multi-use product for which the dangers (and therefore the need for the optional equipment) vary depending on where it is used. (*See* Def.Mem. at 38 ("here, there is no allegation that the trampoline was a multi-use product")). Correspondingly, with regard to factor (3), there is no evidence that the buyer (or user) was "in a position, given the range of uses of the product, to balance the benefits and the risks of not having the safety device in the specifically contemplated circumstances" of the product's use. *Scarangella,* 93 N.Y.2d at 661, 695 N.Y.S.2d 520, 717 N.E.2d 679; *see also Rosado,* 66 N.Y.2d at 26, 494 N.Y.S.2d 851, 484 N.E.2d 1354 ("where, as here, the manufacturer is in the best position to know the dangers inherent in its product, and the dangers do not vary depending on jobsite, it is also in the best position to determine what safety devices should be employed"). Thus, there is no basis in the law for defendants' claim that the availability of alternative safety designs—in this case, some of which were already on the market but not offered in any way by the manufacturer—is "irrelevant."

For all these reasons, the defendants' motion for summary judgment dismissing the strict liability claims is denied.

### CONCLUSION

For the reasons set forth herein, defendants' motion for summary judgment dis-

missing plaintiff's claims sounding in negligence, strict liability, and breach of implied warranty is denied in its entirety.